252 P.3d 424 (2011)
STATE of Washington, Respondent,
v.
Daniel Robert WEBB, Appellant.
No. 28627-4-III.
Court of Appeals of Washington, Division 3.
June 7, 2011.
*426 David L. Donnan, Elaine L. Winters, Washington Appellate Project, Seattle, WA, for Appellant.
Laura Candace Hooper, Kittitas Co. Courthouse, Ellensburg, WA, for Respondent.
KULIK, C.J.
¶ 1 In 2009, Daniel Robert Webb took his nine-year-old daughter with him when he robbed a minimart with a toy gun. Mr. Webb appeals his conviction for reckless endangerment and first degree robbery with the aggravating factor that the offense involved a destructive and foreseeable impact on a person other than the victim.
¶ 2 Mr. Webb contends there was insufficient evidence to establish that he displayed what appeared to be a firearm and that the robbery involved a destructive and foreseeable impact on his daughter. He also contends the aggravating factor violates due process vagueness prohibitions and the court erred when instructing the jury. Mr. Webb further contends the court erred by failing to give a voluntary intoxication instruction.
¶ 3 We affirm the convictions but reverse the aggravating factor and remand for resentencing within the standard range.

FACTS
¶ 4 On March 31, 2009, Eric Owens was working the night shift at a minimart in Thorp, Washington. Just before 3:00 a.m., a man and a little girl walked into the store. The two were later identified as Daniel Robert Webb and his daughter.
¶ 5 The girl got a drink from the cooler and Mr. Webb got a cup of coffee using two stacked paper cups. Mr. Owens told Mr. Webb to use a sleeve because he would be charged for one of the cups. Mr. Webb became threatening. With his nine-year-old daughter at his side, Mr. Webb gruffly told Mr. Owens to give him the gasoline, the coffee, and the girl's drink or he would get hot coffee in his face. Mr. Webb then asked something about the drawer and pulled out what appeared to be a gun. Mr. Owens asked if he was being robbed. Mr. Owens testified that the gun looked very real.
¶ 6 While the gun was pointed at him, Mr. Owens asked Mr. Webb if he wanted the whole drawer or just the cash. Mr. Webb said, "`Just give me the cash from the drawer.'" I Report of Proceedings (RP) at 10. Mr. Webb told Mr. Owens not to call the police or he would come back and kill him. At first, Mr. Owens looked at the gun and thought, "I am dead." I RP at 10. He was afraid for his life, fearful for the little girl, and worried that a customer might walk in. But as Mr. Owens looked at the gun, he noticed that it appeared to be plastic. Mr. Webb put the gun back in his pocket, and Mr. Owens gave him the cash. The gun was displayed for only 5 to 10 seconds.
¶ 7 Over time, Mr. Owens decided there was a strong possibility that the gun was not real. Mr. Owens testified that when Mr. Webb pulled the gun, his daughter was absolutely stunned and afraid. Mr. Owens did not say anything about alcohol or about Mr. Webb being intoxicated.
*427 ¶ 8 While Mr. Owens was getting the cash, Mr. Webb talked about his financial problems and his need to take care of his daughter. Concerned for his life and for the little girl, Mr. Owens thought it was best to do what Mr. Webb asked and to stay calm and talk to him. The minimart's policy required Mr. Owens to turn over the cash when confronted by a robber. Mr. Webb had his daughter go out to the car. Mr. Webb told Mr. Owens that he was not going to hurt him. Mr. Webb handed the cup of coffee back to Mr. Owens, warned him not to call the police, and left. Mr. Owens immediately called 911 and reported the robbery.
¶ 9 At trial, the surveillance videotape of the robbery and photographs of the tape were shown to the jury. Mr. Owens told the jury that at the time he did not know whether Mr. Webb was going to shoot him. The 911; tape was also played for the jury. On the tape, Mr. Owens told the operator that the person who robbed him had a toy gun. He described it as a black plastic toy handgun. Mr. Owens stated that he was afraid that Mr. Webb would return. Mr. Owens asked the police to leave a patrol car parked at the minimart for the rest of the night.
¶ 10 An hour before the robbery at the minimart, Mr. Webb, a member of Alcoholics Anonymous (AA) called a former AA sponsor (the sponsor) in Yakima. Mr. Webb asked if he could come over and stay for the night at the sponsor's house. Mr. Webb had taken his daughter, left his wife, and now Mr. Webb and his daughter needed a place to stay, the sponsor testified that Mr. Webb was very upset and sounded intoxicated. The sponsor said at times Mr. Webb sounded rational and at other times he did not. The sponsor offered to pick up Mr. Webb and his daughter, but Mr. Webb refused the offer.
¶ 11 After the robbery, Mr. Webb called the sponsor a second time, sounding even more upset and intoxicated. Mr. Webb alternated between making sense and being incoherent. He was still worried that the sponsor would call the police. Mr. Webb stated that he had done something really big. He put his daughter on the telephone and told her to tell the sponsor what they did. The daughter said, "`We robbed a store.'" I RP at 64. During the call, Mr. Webb said that he had eluded police and was driving 80 m.p.h.
¶ 12 Mr. Webb and his daughter arrived at the sponsor's house one and one-half hours later. The sponsor testified that Mr. Webb seemed so drunk that he could hardly stand up. Mr. Webb was getting sick and crying. The sponsor stated that Mr. Webb seemed so drunk or high that it seemed impossible that he had driven from Thorp to Yakima. The sponsor tried to take care of the little girl and put her in his daughter's room for safety. Mr. Webb sat down and went in and out of consciousness.
¶ 13 The sponsor tried to lie down for a while but when he heard the little girl get up, he got her some food. She used the computer. They talked. The girl was "stunned," "extremely polite," and "measuring every word." I RP at 70. The sponsor had not seen her like this before in the two years he had known her.
¶ 14 The sponsor made a telephone call. When he came back, Mr. Webb sat up and told the sponsor that he had to do it, that he was doing everything he could to raise money but it was not working, and it was not enough. Mr. Webb stated that he could not stay with his wife anymore and that he had to take care of his daughter.
¶ 15 The sponsor was afraid that Mr. Webb was going to leave with his daughter, and the sponsor feared for her safety. The police called and asked if Mr. Webb was there. The sponsor answered "`yes,'" and twice said quietly, "`[g]et here now.'" I RP at 73. Mr. Webb became suspicious and decided to leave right away. The sponsor tried to get Mr. Webb to leave the little girl with him.
¶ 16 Mr. Webb was arrested a few days later at another friend's home in Yakima. His daughter was with a friend in northern California. Mr. Webb had decided to turn himself in. No weapons were discovered during a search of Mr. Webb, his car, and his friend's home.
¶ 17 Deputy Benjamin Corbett was the first officer on the scene when Mr. Webb was arrested. The deputy testified that he had *428 reviewed the store's surveillance videotape. He thought the toy gun used by Mr. Webb looked real. The deputy testified that if he had been in the store, he would have pulled his gun.
¶ 18 Detective Greg Bannister testified that Mr. Webb told detectives that he had no recollection of the robbery. Mr. Webb also claimed he had an alcoholic blackout. Mr. Webb stated that he had seen a photograph of himself and his daughter in the minimart and his daughter had a very scared look on her face. Mr. Webb said that he just found $150 in his pocket at the sponsor's house and had no memory of where he got it. Detective Bannister testified that Mr. Webb appeared to be intoxicated on the videotape but that sometimes people who are in blackouts can function.
¶ 19 Two models of the toy gun that Mr. Webb claimed to own were admitted. This toy gun is identical to a Colt 1911, except for weight. The original version of the toy gun had an orange tip. On the second toy gun, the tip was painted black so it matched the one Mr. Webb used at the robbery. Deputy Eric Vraves testified about purchasing and modifying the guns. He stated that it is against federal law to alter or remove the orange marking or to paint over the transparent part of this gun.
¶ 20 Detective Darren Higashiyama discussed how the plastic gun Mr. Webb used was identical to a real Colt 1911, except for weight. Detective Higashiyama testified that if officers encountered someone with one of these guns, the officers would draw on him or her and, if the gun was leveled at someone, the officers would be forced to fire. Detective Higashiyama also stated that Mr. Webb's wife would not let police speak with her daughter because she did not want the girl disturbed.
¶ 21 Detective Higashiyama also testified about Mr. Webb's statement. Mr. Webb told the detective that he remembered leaving with his daughter and going to the sponsor's residence, but not the drive in between. He remembered throwing the gun out the window and gassing up in Yakima where he discovered the extra money in his pocket.
¶ 22 The jury convicted Mr. Webb of reckless endangerment and first degree robbery with the aggravating factor that the offense involved a destructive and foreseeable impact on persons other than the victim. Mr. Webb appeals.

ANALYSIS
¶ 23 Evidence is sufficient to support a criminal conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom. Id. All reasonable inferences must be drawn in favor of the State and most strongly against the defendant. Id.
¶ 24 Robbery is defined as:
A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.
RCW 9A.56.190.
¶ 25 Mr. Webb was convicted of first degree robbery. A person is guilty of first degree robbery if:
(a) In the commission of a robbery or of immediate flight therefrom, he or she:
(i) Is armed with a deadly weapon; or
(ii) Displays what appears to be a firearm or other deadly weapon; or

*429 (iii) Inflicts bodily injury.
RCW 9A.56.200(1).
¶ 26 Display. Mr. Webb contends the evidence is insufficient to prove that he displayed what appeared to be a deadly weapon. He points out that Mr. Owens first thought the gun was real and feared for his life, but he later realized that the gun was a toy. Mr. Webb maintains that the question of whether something that looks like a gun must be examined from the viewpoint of the victim. Here, Mr. Owens quickly realized that the gun was a toy. Mr. Webb asserts that Mr. Owens complied with Mr. Webb's demand for cash because of store policy, not because of the toy gun.
¶ 27 The State disagrees that the fact finder is limited to the victim's viewpoint when determining whether the robber displayed what appeared to be a weapon. The State argues that the fact finder can consider other viewpoints besides the victim's. To this end, the State submitted expert testimony to help the jury with its decision. The State introduced the testimony of Detective Higashiyama, who testified that the toy gun looked real and that any officer who walked in on the robbery would have begun shooting.
¶ 28 The definitional statute for robbery, RCW 9A.56.190, requires the defendant unlawfully take personal property from another person against his will by the use or threatened use of immediate violence, or fear, or injury. Because robbery requires the use of force against the victim's will by use or threatened use of force, the inquiry must necessarily focus on the victim's point of view. The legislature enacted RCW 9A.56.200(1)(a)(ii) to "proscribe conduct in the course of a robbery which leads the victim to believe the robber is armed with a deadly weapon, whether the weapon is actually loaded and operable or not, and whether the weapon is real or toy." State v. Henderson, 34 Wash.App. 865, 868, 664 P.2d 1291 (1983) (emphasis added). And in State v. Kennard, this court approved a definition of "display" based on the victim's view. State v. Kennard, 101 Wash.App. 533, 537, 6 P.3d 38 (2000).
¶ 29 In State v. Scherz, 107 Wash.App. 427, 27 P.3d 252 (2001), the court concluded that the defendant's statement, without more, that he had a hand grenade in his pocket was insufficient to meet the "display" requirement of first degree robbery. Id. at 436, 27 P.3d 252. In reaching its decision, Scherz relied on Henderson, concluding that the legislature had intended to proscribe conduct during a robbery "that leads the victim to believe the robber is armed with a deadly weapon, whether or not the weapon is actually loaded and operable, and whether it is real or a toy." Id. at 432, 27 P.3d 252 (citing Henderson, 34 Wash.App. at 868, 664 P.2d 1291) (emphasis added).
¶ 30 Mr. Webb contends he did not display what appeared to be a deadly weapon because Mr. Owens knew the gun was a toy. This is an oversimplification of the facts. Mr. Webb pointed the toy gun at Mr. Owens and stated that he wanted the cash in the drawer and that he would kill Mr. Owens if he called the police. Mr. Owens looked at the gun and thought "I am dead." I RP at 10. He feared for his life, he feared for the little girl, and he feared that a customer might walk into the minimart. Before Mr. Owens turned over the cash, he looked at the gun and realized it was plastic. But after the robbery, Mr. Owens was so nervous about Mr. Webb's threat to kill him that he asked for the Washington State Patrol to park a car at the minimart for the night.
¶ 31 Mr. Webb suggests that the victim's perceptions must remain the same throughout the robbery. In other words, what appears to be a deadly weapon must remain deadly for the duration of the crime. The language of the statute does not support a reading that the deadly weapon must remain deadly throughout the crime. Instead, the statute requires that the person "[d]isplays what appears to be a firearm or other deadly weapon," during or in the flight from the robbery. RCW 9A.56.200(1)(a). This language does not require that the display of what appears to be a deadly weapon must continue throughout the course of robbery.
¶ 32 The evidence is sufficient to support Mr. Webb's conviction for first degree robbery *430 when he threatened Mr. Owens with what Mr. Owens believed was a firearm.
¶ 33 Aggravating Factor. The facts supporting an aggravating factor must be proved to a jury beyond a reasonable doubt. RCW 9.94A.537(3). This court uses the same standard of review for the sufficiency of the evidence of an aggravating factor as it does to the sufficiency of the evidence of the elements of a crime. See State v. Yarbrough, 151 Wash.App. 66, 96, 210 P.3d 1029 (2009).
¶ 34 If a statute is clear on its face, its meaning is to be derived from the plain language of the statute alone. Legislative definitions included in the statute are controlling, but in the absence of a statutory definition, this court will give a term its plain and ordinary meaning ascertained from a standard dictionary. State v. Watson, 146 Wash.2d 947, 954-55, 51 P.3d 66 (2002).
¶ 35 The aggravating factor found by this jury was that "[t]he offense involved a destructive and foreseeable impact on persons other than the victim." RCW 9.94A.535(3)(r). Here, the parties disagree as to whether there was evidence of a destructive impact on Mr. Webb's daughter. In the absence of a statutory definition, we will give these terms their dictionary meanings.
¶ 36 "Destructive" is an adjective meaning: "[H]aving the capability, property, or effect of destroying: causing destruction." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 615 (1993). An exceptional sentence based on a foreseeable and destructive impact on others requires an impact that is foreseeable to the defendant and "of a destructive nature that is not normally associated with the commission of the offense in question." State v. Cuevas-Diaz, 61 Wash. App. 902, 906, 812 P.2d 883 (1991). When used as a noun, the definition of "impact" is: "[T]he force of impression of one thing on another: . . . a concentrated force producing change: an esp. forceful effect checking or forcing change." WEBSTER'S at 1131.
¶ 37 Cases examining this aggravating factor have often involved the presence of children. See Cuevas-Diaz, 61 Wash.App. 902, 812 P.2d 883; State v. Jackson, 150 Wash.2d 251, 76 P.3d 217 (2003). These pre-Blakely[1] cases are instructive in showing the type of evidence that may support this aggravating factor.
¶ 38 In Cuevas-Diaz, the defendant broke into a woman's home and attempted to rape her. Her children saw the stranger chase their screaming mother into their bedroom. The sentencing court concluded the children were severely traumatized at the time of the incident and at sentencing they still suffered "`extreme anxiety and fear for their safety.'" Cuevas-Diaz, 61 Wash.App. at 904, 812 P.2d 883. In Jackson, a father murdered his daughter but then told police she was missing. The child's teacher, school principal, and school counselor testified that the false abduction story caused the girl's classmates to have nightmares, problems with homework, and fears about walking to school alone. Jackson, 150 Wash.2d at 275-76, 76 P.3d 217.
¶ 39 In both of these cases, the evidence revealed a destructive impact observable after the crime occurred.
¶ 40 Here, Mr. Webb took his nine-year-old daughter with him when he robbed the minimart. Videotape and photographs show the girl standing next to Mr. Webb when he pulled the gun and threatened Mr. Owens. The look of shock on her face is undeniable. Mr. Owens testified that the girl was "absolutely stunned" and looked afraid. I RP at 39.
¶ 41 The sponsor learned about the robbery when Mr. Webb handed his daughter the telephone and said, "`tell him what we did.'" I RP at 64. The girl told the sponsor, "`We robbed a store.'" I RP at 64. When the girl was at the sponsor's home, he noted that she was "stunned," "extremely polite," and "measuring every word." I RP at 70. The sponsor had seen the girl before but had not seen her like this. However, while at the sponsor's house, the girl also ate *431 a meal, used the computer, and participated in normal conversation.
¶ 42 Later, law enforcement tried to interview the girl, but her mother did not want her disturbed. The prosecuting attorney subpoenaed the mother and daughter but, when they failed to appear to testify, the State elected not to pursue the matter. The State provided no testimony from a relative, school counselor, or other person about any impact left by witnessing the robbery.
¶ 43 Mr. Webb argues the evidence is insufficient because no evidence was introduced showing that his daughter was severely traumatized. The question here is whether Mr. Webb's crime involved a destructive and foreseeable impact on his daughter. While it is true that Mr. Webb's decision to take his daughter to a robbery was reprehensible, and that a child's presence at a robbery committed by her father would be harmful to most children, we cannot conclude that the State met its burden on this aggravating factor.
¶ 44 To prove this aggravating factor, the State had to prove a foreseeable and destructive impact on Mr. Webb's daughter beyond a reasonable doubt. The evidence here provides descriptions of the girl and her behavior around the time of the robbery, but the evidence does not show, beyond a reasonable doubt, a lasting destructive impact. Thus, we are constrained to reverse the aggravating factor and remand for sentencing within the standard range. Because of our disposition, we need not address Mr. Webb's other assertions of error related to the aggravating factor.
¶ 45 Voluntary Intoxication Instruction. If supported by evidence, a proposed instruction should be given if it properly states the law, is not misleading, and allows the party to argue his or her theory of the case. State v. Redmond, 150 Wash.2d 489, 493, 78 P.3d 1001 (2003). When considering whether a proposed jury instruction is supported by the evidence, the trial court must examine the evidence and draw all reasonable inferences in the light most favorable to the requesting party. State v. Hanson, 59 Wash.App. 651, 656-57, 800 P.2d 1124 (1990).
¶ 46 A "voluntary intoxication" instruction allows the jury to consider evidence of intoxication when deciding whether the State proved that the defendant acted with the requisite intent. State v. Thomas, 123 Wash.App. 771, 781, 98 P.3d 1258 (2004). A voluntary intoxication defense does not require expert testimony because the effects of alcohol are commonly known and the jurors can draw reasonable inferences from the evidence presented. Id. at 781-82, 98 P.3d 1258.
¶ 47 Three conditions must be met to justify a voluntary intoxication instruction. State v. Ager, 128 Wash.2d 85, 95, 904 P.2d 715 (1995). Specifically, the court must provide a voluntary intoxication instruction when (1) the charged offense has a particular mens rea, (2) there is substantial evidence the defendant was drinking and/or using drugs, and (3) there is evidence the drinking or drug use affected the defendant's ability to acquire the required mental state. Id. Evidence of alcohol consumption is only relevant if it tends to establish that the consumption occurred before the charged event. State v. Priest, 100 Wash.App. 451, 454-55, 997 P.2d 452 (2000).
¶ 48 At the conclusion of his case, Mr. Webb requested a voluntary intoxication instruction. He maintained that he was intoxicated at the time of the robbery and that alcohol impaired his ability to make decisions and form the required mental state. The trial court denied this request.
¶ 49 The first part of the test is met. The intent required to prove first degree robbery is the intent to deprive the victim of property. State v. Decker, 127 Wash.App. 427, 431, 111 P.3d 286 (2005). Here, Mr. Webb intended to steal money from the minimart.
¶ 50 The second part of the test is also met. While there is substantial evidence that Mr. Webb was intoxicated after the robbery, there is less than substantial evidence that he had been drinking before the robbery. While the videotape of the robbery includes a recording during which Mr. Webb shows signs of intoxication, including slurred *432 speech and the misuse of words, he was not swaying or unsteady on his feet.
¶ 51 Equally significant, the sponsor spoke to Mr. Webb on the telephone prior to the robbery. The sponsor testified that Mr. Webb sounded intoxicated in that he was clear minded but would then begin to make no sense or get angry. The sponsor explained that Mr. Webb "drinks hard" and that his speech is barely affected but he "came to swinging and just growling and stuff." II RP at 12. Mr. Webb was clearly intoxicated when he arrived at the sponsor's house one and one-half hours after the robbery. The evidence may be sufficient to show that Mr. Webb was intoxicated prior to the robbery.
¶ 52 Even if we assume that Mr. Webb presented sufficient evidence to establish that he was intoxicated at the time of the robbery, the evidence, when taken in the light most favorable to Mr. Webb, is not sufficient to meet the third test. The third test requires Mr. Webb to present evidence that his drinking affected his ability to acquire the required mental state. "Put another way, the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." State v. Gabryschak, 83 Wash.App. 249, 252-53, 921 P.2d 549 (1996).
¶ 53 Mr. Webb showed unacceptably bad judgment when he took his daughter with him to rob the minimart. But his other actions show that he was capable of forming the intent to steal money from the minimart. Mr. Webb entered the minimart with an altered toy gun in his possession. He told the clerk he was stealing the money to provide for himself and his daughter. Mr. Webb told the clerk that he was out of work and made excuses for why he was robbing the minimart. Mr. Webb was able to have a conversation with the clerk about hard times and raising kids.
¶ 54 Mr. Webb called the sponsor immediately after the robbery and had his daughter tell the sponsor that they had robbed a store. When Mr. Webb got to the sponsor's house, Mr. Webb told the sponsor that he had pulled out a gun and told the clerk he was taking care of his family.
¶ 55 Reviewing the evidence in the light most favorable to Mr. Webb, there is insufficient evidence to conclude that his intoxication affected his ability to acquire the required mental state to commit the robbery.
¶ 56 Mr. Webb contends Stevens supports his position that a voluntary intoxication instruction was required. He maintains that Stevens did not apply the three-part test and was unconcerned by the lack of direct evidence that alcohol impacted the ability to form the required mental state.
¶ 57 Randall Stevens consumed two 40-ounce bottles of beer and two shots of whiskey before meeting two girls, age 13 and age 12, by a shopping area. Stevens, 158 Wash.2d at 306, 143 P.3d 817. The three discussed whether Mr. Stevens was in the band Metallica. The girls testified that Mr. Stevens told them he was in Metallica. The girls left. Mr. Stevens encountered the girls one hour later, and they asked if they could take his picture. The first picture showed Mr. Stevens sitting next to one of the girls with his hand on her breast. Id. at 307, 143 P.3d 817. He was convicted of second degree child molestation. Id.
¶ 58 After a brief discussion, the court in Stevens determined that the trial court erred by failing to give a voluntary intoxication instruction. Id. at 310, 143 P.3d 817. Significantly, in Stevens, the State was not arguing that there was insufficient evidence to support a voluntary intoxication instruction. Id. at 310 n. 3, 143 P.3d 817. Moreover, contrary to Mr. Webb's assertions, the court did consider part three of the test, stating: "Had the jury believed [Mr.] Stevens' evidence and had they been properly instructed, the jury could reasonably have found [Mr.] Stevens' intoxication prevented him from acting for the purpose of sexual gratification." Id. at 310, 143 P.3d 817.
¶ 59 We conclude that the court did not err by denying the voluntary intoxication instruction.
¶ 60 In his statement of additional grounds for review, Mr. Webb argues that the jury should have been instructed on diminished *433 capacity. But there is no evidence here that Mr. Webb suffered from a mental disorder which deprived him of the ability to form the required mental state.
¶ 61 Because the aggravating factor is not supported by sufficient evidence, we need not address the remaining challenges to the aggravating factor raised by Mr. Webb.
¶ 62 We affirm the convictions but reverse the aggravating factor and remand for resentencing within the standard range.
I CONCUR: SIDDOWAY,J.
SWEENEY, J. (dissenting).
¶ 63 Robert Webb was entitled to a voluntary intoxication instruction when the evidence here is viewed in a light most favorable to him.
¶ 64 A defendant is entitled to a voluntary intoxication instruction if the crime charged requires proof of a certain mental state and there is evidence that he was drinking and the alcohol affected his ability to form the requisite mental state. State v. Gallegos, 65 Wash.App. 230, 238, 828 P.2d 37 (1992).
¶ 65 The only question before us is whether Mr. Webb produced evidence from which a jury could find that he was too intoxicated to form the intent necessary to commit this robbery. When the evidence presented at trial is viewed in a light most favorable to Mr. Webb, it shows:
 Mr. Webb is an alcoholic and a member of Alcoholics Anonymous (AA).
 An hour before the robbery, he called his AA sponsor in Yakima. Mr. Webb was very upset and sounded intoxicated. The sponsor said Mr. Webb sounded rational at times and, at other times, he did not.
 Mr. Webb slurred and misused words at the time of the robbery.
 He robbed the store, with his nine-year-old daughter in tow, after a dispute over taking and then refusing to pay for a second coffee cup.
 After the robbery, Mr. Webb called the sponsor again. On the phone, he alternated between making sense and being incoherent.
 Mr. Webb then drove to the sponsor's home after the robbery. The sponsor reported that Mr. Webb seemed so drunk that he could hardly stand up. Mr. Webb was getting sick and was crying. The sponsor could not tell whether Mr. Webb could see through his tears. The sponsor said that Mr. Webb seemed so drunk or high that it seemed impossible that he had driven from Thorp to Yakima, but he did. Mr. Webb sat down and went in and out of consciousness.
 The sponsor tried to get Mr. Webb to leave the little girl with him. Mr. Webb said delirium tremens (a severe form of alcohol withdrawal) was bothering him and he was sick.
 When interviewed by police, Mr. Webb had no memory of the robbery.
 Detective Greg Bannister testified that Mr. Webb appeared to be intoxicated on the videotape.
¶ 66 I conclude that a jury could easily find from this evidence that Mr. Webb was too drunk to form the necessary intent to commit first degree robbery. No doubt there was also evidence from which the jury could find that he did have the mental wherewithal to commit first degree robbery. But Mr. Webb was entitled to have a jury decide what was most persuasive. The test on appeal is whether Mr. Webb produced substantial evidence from which a jury could conclude that he could not form the requisite intent or, at least, that there is a reasonable doubt that he could form the requisite intent. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992); State v. Douglas, 128 Wash.App. 555, 561-62, 116 P.3d 1012 (2005). Beyond a reasonable doubt implicates the burden of persuasion, and the jury, not this court or the trial judge, determines whether that burden has been met. State v. Huff, 64 Wash.App. 641, 655, 826 P.2d 698 (1992). Alcohol's effects are commonly known, and jurors are in the best position to draw reasonable inferences from testimony about the effects of alcohol on a defendant. State v. Thomas, 123 Wash.App. 771, 782, 98 P.3d 1258 (2004); State v. Kruger, 116 Wash.App. 685, 692-93, *434 67 P.3d 1147 (2003); State v. Smissaert, 41 Wash.App. 813, 815, 706 P.2d 647 (1985).
¶ 67 I am also not persuaded by the State's reliance on State v. Gabryschak, 83 Wash. App. 249, 921 P.2d 549 (1996). The Gabryschak court began its analysis with the observation that "[i]ntoxication is not an all-or-nothing proposition. A person can be intoxicated and still be able to form the requisite mental state, or he can be so intoxicated as to be unconscious." 83 Wash.App. at 254, 921 P.2d 549. I agree with these observations. But the opinion side-stepped an important questionwho decides whether the defendant was too intoxicated to form the necessary mens rea? The jury or a panel of appellate judges? In Gabryschak, the appellate court itself evaluated the evidence of the defendant's intoxication and found, as a matter of fact, that the defendant was not drunk enough to be unable to have the mental state required to commit the crime. Id. at 254-55, 921 P.2d 549. Significantly, Gabryschak does not discuss or even mention what standard of review the court was applying. That is an important omission. Again, the question in Gabryschak and the question before us is whether the defendant has met his burden of production. Huff, 64 Wash.App. at 655, 826 P.2d 698. That is, the question is whether there was sufficient evidence presented to this jury to require the instruction. Gallegos, 65 Wash.App. at 237-38, 828 P.2d 37. As Gabryschak shows, anything more moves us into deciding just how persuasive this evidence is. 83 Wash.App. at 254-55, 921 P.2d 549. And that is the jury's function. Douglas, 128 Wash.App. at 561-62, 116 P.3d 1012; Huff, 64 Wash.App. at 655, 826 P.2d 698.
¶ 68 In sum, Mr. Webb produced evidence that he was drunk during this robbery. It was for the jury to decide whether the effects of the alcohol on his mind and body prevented him from forming the necessary intent required to commit this crime. I would conclude that there is substantial evidence in this record to support a voluntary intoxication instruction and that the trial court erred as a matter of law by refusing to give it. I would, therefore, reverse and remand for trial with proper instructions.
¶ 69 I also disagree with the majority's conclusion that substantial evidence does not support the aggravating factor for an exceptional sentence. The test for substantial evidence is modest. We look for evidence that supports the fact finder's decision; it is not our function to weigh the evidence for and against it. State v. Bunch, 2 Wash.App. 189, 191, 467 P.2d 212 (1970). The evidence produced here goes both ways. But I would conclude that the expression on the face of Mr. Webb's daughter and the sponsor's later observations of the child are substantial evidence of the aggravating factor.
¶ 70 I respectfully dissent.
NOTES
[1] Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).