# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51112-6-II |
| Respondent, | |
| v. | |
| JACOB LOYD EVELAND, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Jacob L. Eveland appeals his convictions for first degree murder and first degree arson.  Eveland argues that the trial court denied his right to present a defense by erroneously excluding evidence that in the days and months leading up to the incident, Eveland consumed drugs and exhibited strange behavior.  Eveland argues that the evidence was relevant to his defense theory that he was unable to form the necessary intent to commit the crimes and that it supported a voluntary intoxication instruction, which the trial court refused to give.  We affirm Eveland's convictions.

## FACTS

### I. THE INCIDENT

On May 31, 2016, at approximately 9:30 P.M., Roy Jones's grandmother drove Jones to the house where he was living.  Eveland owned the home, and Jones lived in the basement.  When Jones's grandmother dropped Jones off, Eveland was sitting in a gold truck.  It was later discovered

that the truck belonged to a relative of Eveland's ex-wife, Terry Zolman, who had reported the truck stolen the day before.

Later that night, around 11:00 P.M., Richard Bulley, who lived down a driveway from Eveland, was home with his wife when he heard two loud explosions. Bulley's wife yelled that Eveland's house was on fire and then saw a truck with lights on top coming down the driveway away from Eveland's home.

Bulley told his wife to call 911, and he ran to Eveland's home. When Bulley approached the side of the home to see if anyone was inside, he noticed there was a trail of blood leading away from the door. Bulley followed the trail of blood and discovered Jones's body about 20-to-30 feet from the home.

Six .22 caliber shell casings were found near Jones's body. An autopsy later revealed that Jones had been shot eight-to-ten times in the chest, left arm, armpit, face, and hip. In addition to the gunshot wounds, Jones had also been stabbed seven times in the back, shoulder, neck, and arm. The wounds caused Jones to bleed to death.

Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) investigated the fire at Eveland's home. The lead ATF investigator concluded that the fire was caused by someone pouring several gallons of gasoline down the stairwell to the basement of the house and igniting it.

A week after the incident, Seattle police located Zolman's stolen truck and witnessed Eveland get into the truck. Seattle police arrested Eveland. Inside the truck, police found a box of unfired .22 caliber cartridges, a gym bag, and two pipes typically used for smoking marijuana

and methamphetamine. Blood stains on a sock found in the gym bag and on a shoe Eveland was wearing when he was arrested, matched Jones's DNA.

Eveland made four audio-taped statements to law enforcement and a video reenacting how he killed Jones and set the fire. In the first audio recording, Eveland told police that he killed Jones because "[h]e had wronged me in the past and for some selfish reason, I thought I would make it right." Exhibit 129 at 10. Eveland explained that he stabbed Jones many times then shot him six or seven times "to make sure it was done with." Exhibit 129 at 12. Eveland explained his motivation for killing Jones, "I felt that he was to blame for everything," "Yeah, basically I snapped, you know. I mean everything that happened that Roy had done to me," and "I know this sounds sadistic, but I wanted a chance for him to look in my eyes and feel the pain that I felt from him taking everything from me." Exhibit 129 at 92, 93, 99.

Eveland also confessed to using gasoline to start the fire. Eveland explained that he started the fire to get rid of all the bad memories in the house and to get rid of evidence.

When asked if he had used drugs in the previous two weeks, Eveland told law enforcement "No sir, I'm clean." Exhibit 129 at 6. He then added that he had smoked marijuana and "drank once in the two weeks." Exhibit 129 at 6. Later, he said that "[i]n the last two weeks, I've had four drinks in two weeks," and "I mean I'm going to AA, you know, I haven't been drugging." Exhibit 129 at 20. Eveland discussed using cocaine "back in the day" and smoking heroin. Exhibit 129 at 43. He claimed he had not used methamphetamine until "just recently." Exhibit 129 at 43.

II. CHARGES AND TRIAL

The State charged Eveland with first degree murder and first degree arson.[1] The State also alleged that at the time of the commission of the crimes, Eveland was armed with a firearm and/or a deadly weapon, and that Eveland manifested deliberate cruelty to the victim and/or displayed an egregious lack of remorse during the murder.

At trial, Eveland sought to admit voluntary intoxication evidence to support his defense theory that he was too intoxicated from methamphetamine laced with methylenedioxy-methamphetamine (MDMA) to form the requisite intent to be guilty of the crimes. Specifically, Eveland sought to admit testimony from his father, stepmother, and ex-wife that in the months leading to the incident Eveland was using drugs and acting strange; hospital records from March 2016; testimony from a police officer that Eveland was "acting extremely strange" at the Sea-Tac Airport on May 29; and testimony from a man who had met Eveland at American Lake the day before the incident and witnessed Eveland exhibiting strange behavior and using marijuana. Report of Proceedings (RP) (10-19-17) at 469.

Eveland also sought to admit expert testimony from Dr. David Dixon, a clinical psychologist who had conducted a forensic clinical psychological evaluation "to determine [Eveland]'s mental state at the time of the alleged offense and evaluate any possible mental disorder." Clerk's Papers (CP) at 12. In conducting his evaluation, Dr. Dixon examined Eveland for over six hours and reviewed discovery, which included hospital records from a week before the incident showing a positive blood test for methamphetamine. The report noted that hospital

---

[1] RCW 9A.32.030(1)(a), RCW 9A.48.020(1)(a), (b), and (c).

staff assessed Eveland with "tangential thinking" and diagnosed him with an "amphetamine induced psychosis." CP at 22. Dr. Dixon's report concluded:

> There are a number of documentations suggesting Mr. Eveland was toxic by his abuse of methamphetamine in the time frame around the alleged incident.
>
> . . . .
>
> He does not, or is unable, to explain his experience and circumstances at the time of the alleged crime as he denies that he was involved with the incident. Thus assessment of diminished capacity is difficult. Accepting his explanation that the amphetamine drug was cut and laced with MDMA, we would expect his mental status to be effected by an altered mood and perceptions (awareness of surrounding objects and conditions). . .
>
> [MDMA] produces feelings of increased energy, pleasure, emotional warmth and distorted sensory perceptions of time. . . It often causes nausea, blurred vision, chills, and sweating. The effects can last between three to six hours and can cause irritability, impulsiveness, depression, impaired sleep, anxiety, and memory and attention problems.

CP at 22-23.

The State moved to exclude the proffered voluntary intoxication evidence, arguing that none of the evidence demonstrated that Eveland used drugs on the day of the incident. The State specifically argued that Dr. Dixon's proposed testimony failed to meet the threshold for admissibility of expert witness testimony under ER 702 because Dixon could not render an opinion as to whether Eveland's ability to form intent was impaired by his drug use.

The trial court ruled that Dr. Dixon's report and corresponding testimony were inadmissible because there was no evidence that Eveland consumed methamphetamine or methamphetamine laced with MDMA near the time of the incident.

> In this case, Dr. Dixon's testimony could be helpful to the jury if he were able to logically and reasonably connect evidence of the defendant's intoxication to an inability to form criminal intent or premeditation, but he can do neither.
>
> He cannot testify that there was evidence that would allow him to conclude that Mr. Eveland was intoxicated on May 31. And, he certainly cannot testify that

Mr. Eveland was unable to form criminal intent or premeditation at that time. In his report, Dr. Dixon assumes that the defendant used an amphetamine drug that had been laced with MDMA. The only evidence to that was a hearsay statement made by someone to Mr. Eveland, that at some point prior to May 31, that there had been some MDMA-laced methamphetamine introduced into Mr. Eveland's life, and that he may have consumed some of that. But there is no time frame for it at all. We don't know if it was seven days, or three months; there is no time frame for it.

Dr. Dixon then states in his report, that MDMA can cause, quote, increased energy, pleasure, emotion warmth and distorted sensory perceptions of time, closed quote. None of these things, none of those characteristics that he just listed appeared to me to be related to the formation of intent or premeditation.

If a person is experiencing the sensations that Dr. Dixon described in that last sentence I read, there is no reason to believe that that would impair someone's ability to form intent or premeditation.

And, if we then go on another sentence or two later in Dr. Dixon's report, and this may even be more important to the admissibility of Dr. Dixon's testimony. It is his opinion that the [e]ffects of MDMA last between three to four hours. The crimes in this case were committed shortly before 11:00 p.m. on May 31 of 2016. There is absolutely no evidence to support an assertion that Mr. Eveland ingested MDMA, or any substance in the six hours prior to 11 p.m. on May 31 of 2016. In fact, the only evidence which indicates that the defendant ingested a controlled substance was this positive blood test from May 25, and now today, the testimony of Mr. Bishop that he saw Mr. Eveland smoke marijuana once.

So, it is my opinion that the testimony of Dr. Dixon would not be helpful to the jury in this case, and I will not allow him to testify tomorrow.

RP (10-19-17) at 549-51.

During trial, the trial court sustained several objections to Eveland's proffered lay witness testimony regarding Eveland's drug use. Eveland's father, Ray,[2] testified at trial, but the trial court sustained objections to a majority of Ray's testimony.

[Defense counsel]: Okay. So were you aware of any struggles with drug abuse with [Eveland]?

[State]: Objection, relevance.

---

[2] Because Eveland's father and stepmother share Eveland's last name, we refer to them by their first names. We intend no disrespect.

[Court]: Sustained.

[Defense counsel]: Ultimately, [Eveland] stopped working for you; is that right?

[Ray]: Yes.

[Defense counsel]: Why did he stop working for you?

[State]: Objection, relevance.

[Court]: Sustained.

[Defense counsel]: Did you observe any strange behavior from [Eveland]?

[State]: Objection, relevance.

[Court]: Without an appropriate time frame, the objection is sustained.

[Defense counsel]: In 2016, are you aware of any strange behavior from [Eveland]?

[Ray]: Yes.

[Defense counsel]: What was that?

[Ray]: Well, it's noncompliance with what would be normal company rules, as far as time lines, and doing his jobs and his duties. Um, everybody has to excuse me little bit, I wasn't really aware of what some things do to a person, and I didn't figure it out, I didn't know what was going on.

[State]: Objection.

[Court]: Sustained. That last answer will be stricken.

[Defense counsel]: In 2016 did [Eveland] bring some technical speakers or wires over to your house?

[Ray]: Yes, sir.

[State]: Objection.

[Defense counsel]: It's a time frame that goes towards his mental state.

[Court]: What[']s the basis of the objection?

[State]: There is no relevance.

[Court]: Sustained.

[Defense counsel]: No more questions. Thank you.

RP (10-19-17) at 520-22.

Eveland's stepmother, Janet, also testified:

[Defense counsel]: In March 2016, were you notified that [Eveland] was in the hospital?

7

[Janet]:  Yes.

. . . .

[Defense counsel]:  Why was he there?

[State]:  Objection.  Lack of foundation

[Court]:  Sustained.

[Defense counsel]:  So, did you see [Eveland] at the hospital?

[Janet]:  In the parking lot.

. . . .

[Defense counsel]:  Was there anything about his behavior that was strange?

[State]:  Objection, relevance.

[Court]:  Sustained.

[Defense counsel]:  After you arrived at the hospital, what did you do?

[Janet]:  I saw the car parked—his girlfriend's car parked, and they were in the car, and I went over to speak with them, and I spoke with [Eveland] after I—he was incoherent.

[State]:  Objection, nonresponsive.

[Court]:  Sustained.  That last answer will be stricken.  Please ask another question.

[Defense counsel]:  Was [Eveland]'s behavior on that night different than you know [Eveland]'s behavior to normally be?

[State]:  Objection.  Relevance.

[Court]:  Sustained.

[Defense counsel]:  It goes to the theory of the defendant's case.

[Court]:  Sustained.

[Defense counsel]:  No further questions.  Thank you.

RP (10-19-17) at 523-25.

Testimony from Eveland's ex-wife, Angela Pesacreta, followed suit.

[Defense counsel]:  Did you have any contact with [Eveland] in May of 2016?

[Pesacreta]:  Yes.

. . . .

[Defense counsel]:  So how—were you contacted by [Eveland] in May of 2016?

8

[Pesacreta]: Yes.

[Defense counsel]: And how were you contacted?

[Pesacreta]: From his cell phone.

[Defense counsel]: And, what was the nature of that conversation?

[Pesacreta]: That he was stuck somewhere up north, and wanted me to take him to Schick Shadel Hospital.

[Defense counsel]: Was that—did you find that to be a strange request?

[State]: Objection. Relevance.

[Court]: Sustained.

[Defense counsel]: Do you remember the date exactly in May that he asked you that?

[Pesacreta]: I do not.

[Defense counsel]: Did [Eveland] say that he was using drugs?

[State]: Objection, hearsay.

[Court]: Sustained.

[Defense counsel]: It—there is an exception for the defendant's mental state.

[Court]: Sustained.

[Defense counsel]: Did [Eveland] explain that he was having any mental issues when you were speaking with him?

[State]: Objection.

[Defense counsel]: There is a hearsay objection for mental state.

[Court]: Sustained.

[Defense counsel]: No further question, Your Honor.

RP (10-19-17) at 526-27.

Eveland also called a health information services director for Summit Pacific Medical Center to lay the foundation to admit Eveland's hospital records from his admission in March 2016. The State objected, arguing that the records were irrelevant because they were from several months before the incident. The State also argued that there was a lack of foundation to link the records to Eveland. The trial court sustained the State's objection.

Police Officer Jeralyn Berg testified about her interaction with Eveland at the Sea-Tac Airport on May 29, 2016. Officer Berg testified that she contacted Eveland for criminal trespass, and that Eveland did not have a ticket and could not explain why he was at the airport. The trial court sustained the State's objection to Eveland's question, "Did you observe anything about Mr. Eveland that you considered to be different?" RP (10-19-17) at 533. Officer Berg testified that Eveland's clothes were disheveled and that Eveland was sleeping in the airport baggage claim. The trial court sustained the State's objection to Eveland's question, "Is that strange behavior?" RP (10-19-17) at 534. The trial court also ruled that a photograph of Eveland taken that day was inadmissible because it was irrelevant.

A man named Boe Bishop also testified. He testified that he met Eveland at American Lake where Eveland was swimming around the boat dock and helped Bishop tie his boat off to the dock. Bishop recalled that Eveland spent about half an hour on Bishop's boat during which time Eveland smoked marijuana. Bishop testified that within the half hour Eveland was on Bishop's boat, Eveland told him he was moving to California for work, moving to Seattle to live with a girl, and moving to Jamaica to live with friends. Based on of his observations of Eveland that day, Bishop formed the opinion that Eveland was intoxicated.

Bishop originally testified that he met Eveland on May 31, 2016. However, on cross-examination, the State established that Bishop actually interacted with Eveland the day prior, on May 30. Consequently, the trial court ruled that Bishop's testimony was not relevant and that it would be stricken.

Eveland proposed a voluntary intoxication instruction, but the trial court ruled that the evidence did not support giving the instruction.

The jury found Eveland guilty as charged, and the trial court sentenced him to an exceptional sentence. Eveland appeals his convictions.

## ANALYSIS

### I. RIGHT TO PRESENT A DEFENSE

Eveland argues that the trial court denied his right to present his voluntary intoxication defense by erroneously excluding evidence, which would have supported the giving of a voluntary intoxication instruction. We disagree.

### A. LEGAL PRINCIPLES

A criminal defendant has a constitutional right to present a defense. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 3, 22; *State v. Blair*, 3 Wn. App. 2d 343, 349, 415 P.3d 1232 (2018). However, this right is not absolute; it does not extend to irrelevant or inadmissible evidence. *Blair*, 3 Wn. App. at 349. The defendant's right to present a defense is subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

We review the trial court's exclusion of evidence for an abuse of discretion. *Blair*, 3 Wn. App. 2d at 350. And we defer to the trial court's rulings unless "'no reasonable person would take the view adopted by the trial court.'" *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017) (internal quotation marks omitted) (*quoting State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)). If we conclude that there was no abuse of discretion, exclusion of the evidence was not error, and the inquiry ends. *Blair*, 3 Wn. App. 2d at 351. If we conclude that the trial court abused

its discretion in excluding the evidence, we review de novo whether the defendant's right to present a defense has been violated.[3] *Blair*, 3 Wn. App. 2d at 351.

A lay witness can offer opinions that are (1) rationally based on the witness's perceptions, (2) helpful to the trier of fact in understanding the witness's testimony or determining a fact in issue, and (3) not based on scientific, technical, or other specialized knowledge covered by ER 702. ER 701; *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). "A lay witness may express an opinion on another person's intoxication when the witness had the opportunity to observe the affected person." *State v. Quaale*, 182 Wn.2d 191, 201, 340 P.3d 213 (2014).

For expert testimony to be admissible under ER 702, the expert testimony must be helpful to the trier of fact. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 168-69, 288 P.3d 1140 (2012). "Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). Expert testimony is only helpful if it is relevant. *Morris*, 176 Wn.2d at 169.

To be relevant, testimony must have the tendency to make a fact of consequence to the trial's outcome more or less probable. ER 401; *Atsbeha*, 142 Wn.2d at 918. "Evidence is relevant if a logical nexus exists between the evidence and the fact to be established." *State v. Burkins*, 94 Wn. App. 677, 692, 973 P.2d 15 (1999).

---

[3] To the extent *State v. Horn*, 3 Wn. App. 2d 302, 415, P.3d 1225 (2018) articulates a different approach to reviewing whether a trial court's evidentiary ruling violated a defendant's constitutional right to present a defense, under either approach, the result is the same.

B. NO ABUSE OF DISCRETION

1. Lay Testimony

None of Eveland's proffered lay witness testimony was relevant. Assuming all of the State's objections would have been overruled, Eveland may have established the following: (1) his father may have been aware of Eveland's struggle with drug abuse and that he exhibited strange behavior in 2016, including bringing technical speakers or wires to Ray's home; (2) when Eveland was hospitalized two months prior to the incident, Eveland's stepmother thought he was acting different than normal and was incoherent; (3) sometime in May 2016, Eveland told his ex-wife that he was using drugs; (4) Eveland was hospitalized in March 2016, (5) Eveland exhibited strange behavior at Sea-Tac airport two days before the incident; and (6) the day before the incident, Eveland made strange comments, smoked marijuana, and appeared intoxicated at American Lake.

None of Eveland's witnesses observed or interacted with Eveland on the day of the incident. Nothing in the record suggests that Eveland's witnesses could testify to whether Eveland voluntarily used drugs the day of the incident. No evidence supported Eveland's contention that he was under the influence of drugs the day of the incident. The only proffered evidence of Eveland's drug use was that he had smoked marijuana the day before the incident. Whether Eveland exhibited strange behavior in the months leading up to the incident, or smoked marijuana the day before the incident, is not relevant to whether he was voluntarily intoxicated when he killed Jones and set the house on fire. There is no logical nexus between Eveland's proffered lay witness testimony and whether Eveland was intoxicated on May 31. Accordingly, the trial court did not abuse its discretion by excluding the evidence.

2. Expert Testimony

Eveland's proffered expert testimony was neither relevant under ER 401 nor helpful to the trier of fact under ER 702. The relevant question to be resolved by the jury in this case was whether, at the time he committed the acts in question, Eveland's voluntary intoxication prevented him from acting with the requisite criminal mental state. *See State v. Greene*, 139 Wn.2d 64, 73, 984 P.2d 1024 (1999). Accordingly, in order to be helpful to the trier of fact, Dr. Dixon's expert testimony would need to provide some nexus between Eveland's actual drug use and his ability to form the requisite state of mind at the time of the incident. Dr. Dixon's report fell far short of establishing any such nexus.

Dr. Dixon's report stated, "There are a number of documentations suggesting Mr. Eveland was toxic by his abuse of methamphetamine in the time frame around the alleged incident." CP at 22. However, Dr. Dixon did not expand on what "toxic" meant, or if any such toxicity would have impaired Eveland's ability to form the requisite mental state to commit first degree murder and first degree arson. Dr. Dixon's report noted that Eveland had been hospitalized with an episode of psychosis a week prior to the incident, but nothing in Dr. Dixon's report suggested that the psychosis was ongoing on the day of the crimes.

Dr. Dixon also could not offer an assessment of whether Eveland suffered from diminished capacity at the time of the incident because "[h]e does not, or is unable, to explain his experience and circumstance at the time of the alleged crime as he denies that he was involved with the incident." CP at 23. Dr. Dixon opined that even if he accepted Eveland's uncorroborated statement that he had used methamphetamines laced with MDMA, the effects of MDMA "can last

14

between three to six hours," and the record contains no evidence that Eveland used drugs three to six hours before the incident. CP at 23.

It is insufficient for admission that Eveland *may* have been "toxic" due to abuse of methamphetamine around the time of the incident. Because Dr. Dixon could not establish any nexus between Eveland's actual drug use and his ability to form the requisite mental state at the time of the crimes, Dr. Dixon's testimony was not relevant and not helpful to the trier of fact. Consequently, the trial court did not abuse its discretion by excluding his testimony.

Accordingly, because the trial court did not abuse its discretion by excluding Eveland's defense evidence, Eveland's right to present a defense was not violated.

## II. VOLUNTARY INTOXICATION INSTRUCTION

We review the trial court's refusal to give a jury instruction for an abuse of discretion. *State v. Stacy*, 181 Wn. App. 553, 569, 326 P.3d 136 (2014). A proposed instruction should be given if it is supported by evidence, properly states the law, is not misleading, and allows the party to argue his theory of the case. *State v. Webb*, 162 Wn. App. 195, 208, 252 P.3d 424 (2011). "When considering whether a proposed jury instruction is supported by the evidence, the trial court must examine the evidence and draw all reasonable inferences in the light most favorable to the requesting party." *Webb*, 162 Wn. App. at 208.

A voluntary intoxication instruction permits the jury to consider evidence of voluntary intoxication when deciding whether the State proved that the defendant acted with the requisite intent. *Webb*, 162 Wn. App. at 208. To justify a voluntary intoxication instruction, three conditions must be met: (1) the charged offense requires a particular mens rea, (2) there is substantial evidence that the defendant was drinking and/or using drugs, and (3) there is evidence

that the drinking or drug use affected the defendant's ability to acquire the required mens rea. *Webb*, 162 Wn. App. at 209.

Evidence that someone has been drinking or using drugs is not enough; the evidence must show the effects of the substance use. *State v. Kruger*, 116 Wn. App. 685, 692, 67 P.3d 1147 (2003). "Put another way, the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." *State v. Gabryschak*, 83 Wn. App. 249, 252–53, 921 P.2d 549 (1996).

Here, the parties do not dispute that the first condition is met. First degree murder and first degree arson both include a specific mens rea.[4] However, even if all of Eveland's proffered evidence had been admitted, Eveland cannot satisfy the second or third conditions.

As to the second condition, no evidence establishes that Eveland was using drugs prior to killing Jones and setting the house on fire. The only proffered evidence of Eveland's drug use was that Eveland tested positive for methamphetamine a week before the incident, and Bishop's testimony that Eveland had smoked marijuana the day before the incident. No evidence supported Eveland's argument that he was using drugs on the day of the crimes. As to the third condition, no evidence establishes that Eveland's ability to acquire the required mental state was impaired by his drug use. Dr. Dixon was unable to offer any opinion as to whether Eveland's ability to form the requisite mental state to murder Jones or commit arson.

---

[4] Where the charge is first degree murder, the State is required to prove the defendant acted with premeditated intent. RCW 9A.32.030(1)(a). A charge of first degree arson requires the State to prove the defendant knowingly and maliciously caused a fire. RCW 9A.48.020(1).

No. 51112-6-II

Because there is no evidence that Eveland was using drugs the day of the incident or that any possible drug use affected his ability to form the requisite mental state, we hold that the trial court did not abuse its discretion by refusing to give the voluntary intoxication instruction.

CONCLUSION

In sum, we hold that the trial court did not deny Eveland's right to present a defense because it did not abuse its discretion in excluding irrelevant and unhelpful evidence and that Eveland was not entitled to a voluntary intoxication instruction. Accordingly, we affirm Eveland's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MELNICK, P.J.

GLASGOW, J.

17