IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31610-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER JAMES CARLSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Christopher Carlson exploited chivalry to rape his neighbor. He appeals his convictions for second degree rape, first degree burglary, and residential burglary. Carlson contends: (1) the trial court violated his right to a speedy trial, (2) the trial court erred when it refused to instruct the jury on the inferior degree offense of third degree rape, (3) the trial court erred when it refused to instruct the jury on the defense of voluntary intoxication, and (4) the trial court erred when it omitted the phrase "or lack of evidence" from one of the sentences in the jury instruction for "reasonable doubt." We affirm all convictions.

FACTS

On October 6, 2012, around 6:00 p.m., M.J. returned to her Moses Lake apartment, where she lives alone. M.J. was then a 5'2" 58-year-old woman who weighed 125 pounds. A man, whom M.J. rarely saw, but who lived in the apartment complex, sat in his car in a parking lot stall next to the stall in which M.J. parked. As M.J. exited her car and walked toward her apartment, the man followed.

As M.J. approached her apartment, she saw her neighbor Christopher Carlson round a corner. M.J. motioned for Carlson to intervene, which he did. Carlson invited the man to come to Carlson's apartment. M.J. entered her apartment without incident.

Two to three hours later, two of Christopher Carlson's neighbors heard Carlson singing loudly. At trial, neighbor Dan Hennagir testified he heard the singing between 8:30 and 9:00 p.m. through the walls of his apartment. Hennagir opined that Carlson sounded drunk.

> Q    And why do you think that he was inebriated?
> A    I've heard him sing. He sings normally fine. I thought it was—I got a chuckle out of the fact that he was a little over the top.
> Q    What was different about his singing on this occasion that led you to believe that he what inebriated?
> A    The volume, the slurring, the kind of whoops and hollers in between certain phrases.

Report of Proceedings (RP) (Feb. 28, 2013) at 121-22. Hennagir's roommate, Albert Wise, also heard Carlson and testified that Carlson sounded like he had been drinking.

Later that night, M.J. heard a knock at her apartment door. Through a window,

2

M.J. recognized Christopher Carlson at the door and believed he had come to confirm her safety. M.J. allowed Carlson ingress to her apartment. Christopher Carlson wore a Seattle Seahawks cap and held a glass containing clear liquid. Carlson sat down in a recliner chair. He then grabbed M.J. by the wrist and pulled her onto his lap.

A bewildered and nervous M.J. repeatedly asked Carlson what he was doing. M.J. also asked Carlson, "What are you drinking?" RP (Feb. 28, 2013) at 64. She futilely strived to escape his grip. M.J. described what happened next:

> A        He was putting—he was putting his hand—I had sweats on. He was putting his hands down into my pants and—He had his hands in my pants and he had his fingers inside of me. And then—and then he was just sitting there. I was still on his lap and he removed his—he took his penis out and—and then he said "You're going to eat it."
>
> . . . .
> No. No. I said no. And I said "No, I'm not."
>
> . . . .
> I was telling him he was hurting me because he had—he was putting his hands inside of me. And then when I told him no, I wouldn't do that, then his response was—the next thing I knew I was on the floor. He took me down on the floor in front of the recliner. And he was inside of me. Took my sweats off and he was inside of me. Just he put himself in my vagina.

RP (Feb. 28, 2013) at 64-65.

Christopher Carlson pinned M.J. on the apartment floor. Under Carlson's weight, M.J. struggled to breathe. Carlson told M.J.: "look at me. You owe me big time," and "[l]ook at me and tell me that you want me to fuck you." RP (Feb. 28, 2013) at 66, 101.

At trial, the State asked M.J. whether she resisted being pinned. M.J. responded:

Yes. Yes, he's bigger than me and stronger than me and there wasn't anything—there was nothing I could do. And he was being so aggressive and yelling at me and being mean and bizarre and scary that I didn't—I didn't want to—I didn't want to add to it.

RP (Feb. 28, 2013) at 68.

Christopher Carlson ordered M.J. to remove her sweater. She complied out of fear. Carlson demanded M.J. turn over onto her stomach and said: "I bet you want me to fuck you doggie style." RP (Feb. 28, 2013) at 66. As Carlson continued to rape M.J., he told her: "You've let me taste you now. I'm going to want you more. And this was just your pussy, and I'm going to want your ass." RP (Feb. 28, 2013) 67. Carlson grabbed M.J. by the hair, and jerked her head back.

At trial, M.J. described the physical pain Carlson inflicted:

It was painful to me. It was painful from the very beginning when his fingers were inside of me very—just so hard and awful. And then the whole—and then physically, yes, because he was controlling me physically. I couldn't breathe. He was hurting me inside. I couldn't—I just kept saying "You're hurting me".

RP (Feb. 28, 2013) at 70.

While still pinning M.J. to the floor, Carlson whispered to M.J.: "Thank—thank you." RP (Feb. 28, 2013) at 67. Carlson told M.J.: "Blame it on PTSD or whatever, but I'm not going to remember any of this." RP (Feb. 28, 2013) at 67. Carlson promised to return and most likely return that night. His last words to M.J. were: "Lock your door and buy some pepper spray." RP (Feb. 28, 2013) at 68.

4

After Carlson left the apartment, a numb M.J. curled up and remained in this position in the middle of the floor. M.J. felt ashamed and embarrassed. She later locked her door. Around 11:15 p.m., M.J. phoned her friend Taffian Wright, who testified:

> Her voice was quivering and she's like "Oh, my God. You won't believe what just happened. Oh, my God. Oh, my God." And I tried to calm her down. And I said "[M.J.], just talk to me. What happened?" And—and she just kind of broke down and cried a little bit. And I said, you know, "Talk to me." And then she just said "I was just raped." She just blurted it out. And then she started crying hysterically.

RP (Feb. 28, 2013) at 84. M.J. told Wright that she felt dirty. She wanted to shower and scrub her body. Wright encouraged M.J. to go to the hospital and to call police.

The following day, M.J. went to Columbia Basin Hospital, where Dr. Jonathan Crosier examined her. Dr. Crosier testified at trial that M.J. had noticeable erythema, redness indicative of inflammation and trauma, in her vaginal canal and a tender neck. M.J. reported to the attending nurse that she had been raped the previous night by a "very drunk and intoxicated man." RP (Feb. 28, 2013) at 143. At trial, the nurse testified that M.J. commented that the man "forcefully put her to the ground [and] pulled her ponytail." RP (Feb. 28, 2013) at 143.

M.J. reported the sexual assault to the Moses Lake Police Department. Detective Juan Rodriguez interviewed M.J. and inspected her apartment. Detective Rodriguez found Carlson's Seahawks cap behind M.J.'s recliner. Rodriguez searched Carlson's apartment, where he found a nearly empty fifth of vodka in the refrigerator and a second

5

Seattle Seahawks cap.

On October 8, 2012, Detectives Juan Rodriguez and Mike Williams interviewed Christopher Carlson about the rape. During the recorded interview, Carlson stated that, after work on October 6, he arrived home, began drinking vodka about 6:00 p.m., cooked dinner, drank more, sang songs, and passed out about 10:00 p.m. because he was tired. Carlson told the detectives he imbibed almost a fifth of vodka. He denied raping M.J. by stating: "I don't remember that." Ex. 1, at 11 min., 5 sec. Carlson told the detectives that he owned two Seattle Seahawks caps and believed he still possessed both.

## PROCEDURE

In October 2012, the State of Washington charged Christopher Carlson with (1) rape in the second degree by forcible compulsion, (2) burglary in the first degree, and (3) residential burglary. The State also alleged that Carlson committed the burglaries with sexual motivation.

On December 3, 2012, the State and Christopher Carlson stipulated to the following schedule: a status hearing on December 18, 2012; a readiness hearing on January 14, 2013; and trial on January 16, 2013. The scheduling order established the outside date, for purposes of time for trial rules in CrR 3.3, as February 1, 2013. At the December 18, 2012 status hearing, defense counsel informed the court that he was almost ready for trial.

6

On January 3, 2013, at a confession hearing, the trial court corrected the outside trial date from the original scheduling order to February 15, 2013. Defense counsel acknowledged February 15 as the correct date. Counsel informed the trial court, however, that Christopher Carlson would object to any trial continuances and was ready to begin trial on January 16.

At the January 14, 2013 readiness hearing, the State moved to postpone the trial. The State asserted that its cochair deputy prosecutor could not attend on January 16 due to a broken elbow and Dr. Jonathan Crosier was unavailable to testify then because of scheduled work in the hospital emergency room. Also, while M.J. was available January 16, she planned a foreign trip for two weeks thereafter. M.J. had already postponed the extraterritorial travel to be available January 16. During the January 14 hearing, Christopher Carlson objected to a trial continuance.

On January 14, the trial court denied the State's motion to postpone the January 16 trial. The court told the parties that it would address M.J.'s travel plans if and when the conflict in dates actually arose. During the January 14 hearing, the trial court noted that Grant County has two courtrooms for jury trials and three superior court judges, and four criminal cases held priority over the Carlson prosecution for the trial calendar. The trial court kept February 15 as the outside trial date for purposes of CrR 3.3, while recognizing the January 16 trial date might be continued to the following week. Trial did not proceed on January 16 or the following week, presumably due to other criminal trials.

7

The State of Washington and Christopher Carlson appeared in court on January 22, 2013. M.J. had then already journeyed to Europe, where she planned to spend two weeks on both business and vacation. Based on M.J.'s unavailability, the State moved to continue the trial to February 6, 2013. Carlson objected. The trial court asked Carlson's counsel how the delay would prejudice his client, to which defense counsel responded: "the only way that his ability to present a defense is prejudiced is that I have other trials coming up that I need to prepare for as well." RP (Jan. 22, 2013) at 64. The trial court granted the trial continuance, under CrR 3.3(f)(2). The court found: "the defendant will not be prejudiced in the presentation of a defense, even if counsel will be required to juggle those times when he has available to prepare for other matters." RP (Jan. 22, 2013) at 65. The trial court continued the trial date to February 6, 2013, with the deadline for trial being March 8. Carlson filed a written objection to the continuance.

Because of other criminal cases with trial priority, the trial court postponed Christopher Carlson's trial on February 4, 11, and 19, 2013. On February 25, 2013, the State moved to continue the trial one week, which motion the trial court denied. Trial began on February 27, 2013, within the second outside date of March 8.

In opening statements, the State of Washington argued:

> Ladies and Gentlemen, today we're here for one reason and it is because the Defendant raped a 58-year-old grandmother in her apartment. That is it. He doesn't recall this event. He was highly intoxicated. He went there with one purpose in mind. He got what he was going for. It was wrong. We ask you to find him guilty when we complete this case.

RP (Feb. 28, 2013) at 24.

Christopher Carlson chose not to testify at trial. Carlson called one witness in his defense, Corrections Sergeant Phillip Coats, who booked Carlson into jail upon his arrest. Coats testified:

> Q     When you did this with Mr. Carlson did he request that you check for scratches or marks?
> A     Yes, he did.
> Q     And did you do that?
> A     Yes.
> Q     What was—what were your findings?
> A     I did not find any markings at all on him.

RP (March 5, 2013) at 66.

At the conclusion of trial, Christopher Carlson requested the trial court deliver a jury instruction on the offense of third degree rape, a crime inferior to the charged second degree rape. Defense counsel argued:

> [M.J.] herself stated to the nurse that she let him have her way with him [sic], which would support an inference that it wasn't done through force. Her statement about taking off her top and changing her position when asked to do so also support[s] that. Her inability to describe how he managed to force her legs apart also—just that lack of evidence would support an inference that it wasn't by forcible compulsion.

RP (March 5, 2013) at 78. The trial court refused to give the instruction on the ground that the jury could decide there was no forcible compulsion, but no affirmative evidence supported a finding that the penetration was nonconsensual, but not forcible. In other words, either Christopher Carlson forcibly raped M.J., or he did not rape her. Nobody

9

testified that M.J. did not consent to sex and that Christopher Carlson did not force himself on her.

Christopher Carlson also entreated the trial court to instruct the jury on the defense of voluntary intoxication. Carlson proposed this instruction:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted intentionally or knowingly.

Clerk's Papers (CP) at 205. The trial court also refused to provide this jury instruction. The trial court recognized that Carlson presented evidence of intoxication, but found that Carlson presented no evidence as to how the intoxication prevented him from forming an intent to commit the crime.

The trial court's jury instruction 3 instructed the jury regarding the charges against Christopher Carlson and the burden of proof. The instruction included a slight deviation from *11 Washington Practice: Washington Pattern Jury Instructions: Criminal § 4.01, (3d ed. 2008) (WPIC)* specifically in instruction 3's second sentence of the paragraph on reasonable doubt:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence. [If, from such a consideration, you have an abiding belief in the truth of a charge, you are satisfied beyond a reasonable doubt.]

CP at 244. Washington's pattern jury instruction for "reasonable doubt" provides:

10

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence *or lack of evidence*. If, from such a consideration, you have an abiding belief in the truth of a charge, you are satisfied beyond a reasonable doubt as to that charge.

WPIC § 4.01, at 85 (emphasis added). The trial court omitted the phrase "or lack of evidence" from the second sentence of the standard instruction. Carlson did not object to this instruction at trial.

The jury found Christopher Carlson guilty of second degree rape, first degree burglary, and residential burglary. The jury found by special verdict that Carlson committed both burglary charges with a sexual motivation. The trial court sentenced Carlson to 115 months for second degree rape and 50 months for first degree burglary. The court dismissed the residential burglary conviction as merged with first degree burglary.

## LAW AND ANALYSIS

### *Assignment of Error 1: Speedy Trial*

Christopher Carlson contends the trial court violated his right to a speedy trial. He relies on federal and state constitutional provisions, rather than timely trial rights under court rule, CrR 3.3. We review this contention de novo. *State v. Iniguez*, 167 Wn.2d 273, 280-81, 217 P.3d 768 (2009). We reject the assignment.

11

The Evergreen State constitution guarantees an accused the right to a "speedy trial." CONST. art. I, § 22. The federal constitution likewise secures this right. U.S. CONST. amend. VI. In *Iniguez*, our Supreme Court held the Washington Constitution does not afford a defendant greater speedy trial rights than the United States Constitution. *Iniguez*, 167 Wn.2d at 290.

The leading United States Supreme Court decision, *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), announced a loose test for reviewing a claim of an unconstitutionally delayed trial:

> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: *Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.*

*Barker*, 407 U.S. at 530 (emphasis added). Until the accused shows some presumptively prejudicial delay, the court need not inquire into the other factors that enter the balance. *Barker*, 407 U.S. at 530. Thus, a reviewing court should first determine whether the claimed delay was presumptively prejudicial. *Iniguez*, 167 Wn.2d at 283.

Whether a delay is presumptively prejudicial is necessarily a fact-specific inquiry dependent on the circumstances of each case. *Iniguez*, 167 Wn.2d at 291. The defendant bears the burden of showing that the length of the delay crossed a line from ordinary to presumptively prejudicial. *Iniguez*, 167 Wn.2d at 283.

12

> In order to trigger the speedy-trial analysis, "an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay" because, "by definition," the accused "cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."

*State v. Ollivier*, 178 Wn.2d 813, 827, 312 P.3d 1 (2013) (quoting *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)), *cert. denied*, 135 S. Ct. 72 (2014).

Christopher Carlson fails to meet his initial burden of showing any delay was presumptively prejudicial. The State charged Carlson on October 9, 2012, and his case went to trial on February 27, 2013, a continuum of four and a half months. Carlson was not ready for trial until the January 14, 2013 readiness hearing. The remaining six weeks of delay resulted from witness unavailability and other criminal cases holding scheduling priority, both routine impediments. From our experience, we recognize a four and one-half months passage from the filing of charges to trial is unusually quick for a case with such serious charges.

Christopher Carlson relies predominantly on our opinion in *State v. Iniguez*, 143 Wn. App. 845, 180 P.3d 855 (2008), *rev'd*, 167 Wn.2d 273, 217 P.3d 768 (2009). Such reliance is misplaced since our state Supreme Court overruled this court in *Iniguez*. We primarily rely on the principles announced in the Supreme Court *Iniguez* decision to affirm.

*Assignment of Error 2: Inferior Charge of Third Degree Rape*

Christopher Carlson next complains about the trial court's refusal to permit, by jury instruction, the jury to convict on the inferior charge of third degree rape. Washington's criminal code differentiates between inferior degrees and superior degrees of the same crime depending on the seriousness of the circumstances accompanying the crime. Under RCW 10.61.003:

> Upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto, or of an attempt to commit the offense.

A trial court should instruct the jury on an inferior degree offense when:

> (1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting *State v. Peterson*, 133 Wn.2d at 891, 948 P.2d 381 (1997)). A trial court's decision about whether to instruct on a lesser-degree offense involves the application of law to facts, which we review de novo. *State v. Corey*, 181 Wn. App. 272, 276, 325 P.3d 250, *review denied*, 181 Wn.2d 1008 (2014).

The propriety of an inferior crime instruction follows a number of familiar rules. A trial court may not submit a theory to the jury for which there is insufficient evidence.

14

*State v. Wright*, 152 Wn. App. 64, 70, 214 P.3d 968 (2009). We review the evidence in the light most favorable to the instruction's proponent. *State v. Fernandez-Medina*, 141 Wn.2d at 455-56. For the trial court to instruct on an inferior degree offense, the evidence must support an inference that *only* the lesser crime was committed. *State v. Wright*, 152 Wn. App. at 71. In other words, the evidence must permit a rational juror to find the defendant guilty of the lesser offense and acquit him or her of the greater crime. *State v. Fernandez-Medina*, 141 Wn.2d at 456.

In the context of instructing the jury on an inferior charge, unique rules are added to familiar principles. The defendant is not entitled to the instruction on the ground that the jury may disbelief the testimony of the victim or both the victim and the defendant. *State v. Charles*, 126 Wn.2d 353, 355, 894 P.2d 558 (1995); *State v. Ieremia*, 78 Wn. App. 746, 755, 899 P.2d 16 (1995). The jury is not allowed to view the evidence between the extremes of the defendant's and the victim's testimony. The defendant is not entitled to the instruction based on the juror's potential disbelief that the defendant committed the greater degree offense. Instead, the evidence must affirmatively establish that the defendant committed the inferior offense. *State v. Fernandez-Medina*, 141 Wn.2d at 456; *State v. Charles*, 126 Wn.2d at 355; *State v. Corey*, 181 Wn. App. at 276. Affirmative evidence is critical.

Having reviewed general principles of charging the jury on an inferior crime, we now focus on the crime charged Christopher Carlson, second degree rape, and its inferior

15

crime, third degree rape. Chapter 9A.44 RCW addresses sex crimes, including rape.

RCW 9A.44.050 delimits rape in the second degree, in relevant part, as:

> 1) A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:
> (a) By forcible compulsion.

In turn, RCW 9A.44.060 defines rape in the third degree, in pertinent part, as

> (1) A person is guilty of rape in the third degree when, under circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person:
> (a) Where the victim did not consent as defined in RCW 9A.44.010(7), to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct.

RCW 9A.44.010 defines words employed throughout chapter 9A.44 RCW.

> (6) "Forcible compulsion" means physical force which overcomes resistance. . . .
> (7) "Consent" means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact.

To prove second degree rape, the State must present evidence that the defendant had sexual intercourse with the victim by forcible compulsion. *State v. Wright*, 152 Wn. App. at 71 (2009). Forcible compulsion means that the force exerted was directed at overcoming the victim's resistance and was more than that normally required to achieve penetration. *State v. Wright*, 152 Wn. App. at 71; *State v. McKnight*, 54 Wn. App. 521, 528, 774 P.2d 532 (1989). In comparison, third degree rape requires the State to prove the defendant had sexual intercourse with a person who was not the defendant's spouse,

16

who did not consent to the act, and who clearly expressed lack of consent by words or conduct. *State v. Wright*, 152 Wn. App. at 71. Third degree rape does not require forcible compulsion. *Wright*, 152 Wn. App. at 71. It specifically requires circumstances not constituting rape in the second degree. *Wright*, 152 Wn. App. at 71.

The State of Washington concedes that second degree rape and third degree rape proscribe the same offense, and the information in this case charges Carlson with a crime divisible into degrees. Third degree rape is not a lesser included offense of second degree rape, but is an inferior degree offense. *State v. Ieremia*, 78 Wn. App. at 753-54. We must resolve whether evidence supported instructing the jury on third degree rape. Stated differently, we ask whether the jury heard evidence that M.J. did not consent to the digital or penile penetration without any forcible compulsion from Christopher Carlson. Since the jury heard no such evidence, we affirm the denial of the jury instruction. Under M.J.'s testimony, Christopher Carlson forced her into submitting to intercourse. Under Carlson's theory, the two engaged in a consensual association. No one testified that the sex was nonconsensual and unforced.

The controlling decision is *State v. Charles*, 126 Wn.2d 353, 894 P.2d 558 (1995). The Supreme Court affirmed the trial court's refusal to give the defendant's proposed jury instruction on third degree rape. The victim testified that Louis Charles pushed her onto her back on the ground behind a bush, before raping her. Charles argued the sex was consensual. If the jury believed the victim, Charles committed second degree rape.

17

If the jury believed Charles, he committed no crime. There was no affirmative evidence that the intercourse was unforced but nonconsensual.

*State v. Wright*, 152 Wn. App. 64, 214 P.3d 968 (2009), follows the holding in *Charles*. In *Wright*, the State, not the defendant, sought the inferior crime charge. This court reversed Harold Wright's and Richy Carter's conviction for third degree rape on the ground that insufficient evidence supported the convictions. Therefore, the trial court should not have granted a jury instruction on both second degree rape and third degree rape. The victim testified to being pulled into a darkened room, being shoved to a bed, and pressure placed on her shoulder to pin her to the bed. Both defendants claimed consensual sex. The court held that the trial court may not instruct on third degree rape as an inferior offense to second degree rape when the defendant contends the intercourse was consensual and the victim testifies that the intercourse was forced. *State v. Ieremia*, 78 Wn. App. 746, 899 P.2d 16 (1995) has the same outcome and analysis.

The trial court correctly apprehended Washington case law when it refused to instruct the jury on third degree rape.

*Assignment of Error 3: Voluntary Intoxication*

We move to Christopher Carlson's second of three claimed instructional errors. Carlson sought a jury instruction on voluntary intoxication for the burglary charges. A criminal defendant has a right to have the jury instructed on a defense that is supported by substantial evidence. *State v. Walters*, 162 Wn. App. 74, 82, 255 P.3d 835 (2011).

18

RCW 9A.16.090 reads:

No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

A voluntary intoxication instruction allows the jury to consider evidence of intoxication when deciding whether the State proved that the defendant acted with the crime's requisite intent. *State v. Webb*, 162 Wn. App. 195, 208, 252 P.3d 424 (2011). To warrant the instruction, a defendant must show: (1) the charged offense has a particular mental state, (2) there is substantial evidence the defendant was drinking, and (3) there is evidence the drinking affected the defendant's ability to acquire the required mental state. *Webb*, 162 Wn. App. at 209; *State v. Priest*, 100 Wn. App. 451, 454, 997 P.2d 452 (2000); *State v. Gabryschak*, 83 Wn. App. 249, 252, 921 P.2d 549 (1996).

The first factor limits any voluntary intoxication jury instruction to Christopher Carlson's burglary charges, as second degree rape has no mental state requirement. RCW 9A.44.050. First degree burglary and residential burglary both require entering a home with the "intent to commit a crime against a person or property therein." RCW 9A.52.020; RCW 9A.52.025.

The State of Washington argues that Christopher Carlson was not entitled to a voluntary intoxication instruction for two reasons (1) he failed to present substantial

19

evidence that he drank alcohol, and (2) he presented no evidence that drinking affected his ability to acquire the mental state of entering a residence with the intent to commit a crime. We rest our decision only on the second ground.

Intoxication is not an all-or-nothing proposition. *State v. Gabryschak*, 83 Wn. App. at 254. A person may be intoxicated and still be able to form the requisite mental state or can be so intoxicated as to be unconscious. *State v. Gabryschak*, 83 Wn. App. at 254. Somewhere between these two extremes of intoxication is a point on the scale at which a rational trier of fact can conclude that the State has failed to meet its burden of proof with respect to the required mental state. *State v. Gabryschak*, 83 Wn. App. at 254.

Evidence of drinking alone is insufficient to warrant the voluntary intoxication instruction. *State v. Priest*, 100 Wn. App. at 455. Under RCW 9A.16.090, it is not the fact of intoxication which is relevant, but the degree of intoxication and the effect it had on the defendant's ability to formulate the requisite mental state. *State v. Coates*, 107 Wn.2d 882, 891, 735 P.2d 64 (1987). It is well settled that to secure an intoxication instruction in a criminal case there must be substantial evidence of the effects of the alcohol on the defendant's mind or body. *State v. Gallegos*, 65 Wn. App. 230, 237-38, 828 P.2d 37 (1992). Stated differently, the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability. *State v. Griffin*, 100 Wn.2d 417, 418-19, 670 P.2d 265 (1983).

20

A review of the facts in reported decisions where a defendant sought a voluntary intoxication instruction is helpful. In every case requiring an intoxication instruction, the jury heard substantial evidence of the effects of the defendant's drinking, not simply the amount of drinking. In *State v. Rice*, 102 Wn.2d 120, 683 P.2d 199 (1984), the high court ruled that two defendants on trial for murder were entitled to a voluntary intoxication instruction. The defendants drank beer all day, ingested between two and five Quaaludes, spilled beer, and could not hit ping pong balls. One defendant did not feel being struck by a car. Both defendants had slurred speech.

In *State v. Brooks*, 97 Wn.2d 873, 651 P.2d 217 (1982), a voluntary intoxication jury instruction was merited. Steven Brooks drank beer, whiskey, and rum for two days. He ate a spider and washed the arachnid down his throat with whiskey. He had glassy eyes and slurred speech. Brooks' face was blotchy and his eyes buggy red. He trembled, walked lopsided, staggered, and fell in water.

In *State v. Jones*, 95 Wn.2d 616, 628 P.2d 472 (1981), fifteen-year old Stephen Jones was accused of murder. He drank between nine and eleven beers before the incident. He suffered glassy eyes and slurred speech. Officers placed Jones in a drunk tank upon his arrest. The trial court gave a voluntary intoxication instruction and the Supreme Court agreed with the use of the instruction.

In contrast, in *State v. Priest*, 100 Wn. App. 451 (2000), a state patrolman arrested David Priest for driving while intoxicated. Priest's blood alcohol level was .169. The

21

patrolman also discovered that the car driven by Priest was stolen, and the State charged

Priest with taking a motor vehicle without the owner's permission. Although Priest had

imbibed beer, he communicated with the patrolman and even offered to be an informant.

He purposely provided the officer a false name. He drove a vehicle. We affirmed the

trial court's refusal to deliver a voluntary intoxication instruction.

In *State v. Gallegos*, 65 Wn. App. 230, 828 P.2d 37 (1992), the State charged

Francis Gallegos with attempted second degree assault, which required proof of an intent

to engage in sexual intercourse by forcible compulsion. Witnesses testified that Gallegos

drank alcohol before the assault. The witnesses added that Gallegos lost his balance and

knocked items over. Nonetheless, neither witnesses nor Gallegos testified that he did not

acquire the requisite intent or that he lacked awareness of his actions. The trial court

denied a voluntary intoxication instruction, and this court affirmed.

In *State v. Gabryschak*, 83 Wn. App. 249, 921 P.2d 549 (1996), Scott Gabryschak

entered his mother's home by breaking the door. He destroyed furniture inside the home.

Police observed him to be intoxicated, but Gabryschak presented no evidence of the

amount he imbibed. When police arrived, he threatened to physically harm them. He

repeatedly told the officer who drove him to the station that he would kill her. This court

affirmed the trial court's refusal to give an instruction. We noted that he spoke

coherently to police and he knew he was under arrest. The evidence did not show

Gabryschak to slur his speech, to stumble or appear confused, or to be disoriented as to

22

time or place.

This court reviews a trial court's refusal to instruct the jury on voluntary intoxication for an abuse of discretion. *State v. Gallegos*, 65 Wn. App. at 237; *State v. Priest*, 100 Wn. App. at 454. We hold that the trial court did not abuse its discretion.

Christopher Carlson's neighbors testified that his singing sounded drunken and slurred. Nevertheless, the neighbors did not see whether Carlson stumbled or lacked coordination. Carlson did not testify at trial but told officers that he drank a fifth of vodka and eventually passed out. At the same time he claimed not to have entered M.J.'s home and never testified as to when he allegedly blacked out. Carlson told detectives that he passed out because he was tired, not from drinking.

More importantly, no witness testified to the impact of the alcohol on Christopher Carlson's ability to form the intent to enter M.J.'s home to sexually assault her. The overwhelming evidence about his conduct destroys Carlson's claim that he drank a fifth of vodka. Carlson agreed he took a shower and cooked, two activities that require ability to think and control one's actions. He had no difficulty grabbing and pinning M.J. He had no difficulty performing a sexual act. He spoke coherently to M.J. during the crime. He recalled that he might have earlier prevented another neighbor from assaulting M.J., and he told her that she owed him.

The trial court did not err.

23

*Assignment of Error 4: "Or Lack of Evidence" Instruction*

Christopher Carlson contends the trial court erred when it omitted from the court's jury instruction 3 the phrase "or lack of evidence," as found in one of the sentences of WPIC § 4.01. As noted above, the phrase "or lack of evidence" was missing from the second sentence of the reasonable doubt instruction. *Compare* CP at 244 *with* WPIC § 4.01, at 85.

The failure of the court to state clearly to the jury the definition of reasonable doubt and the concomitant necessity for the state to prove each element of the crime by that standard is far more than a simple procedural error. It is a grievous constitutional failure. *State v. McHenry*, 88 Wn.2d 211, 214, 558 P.2d 188 (1977). In *State v. Bennett*, our Supreme Court exercised its inherent supervisory power to instruct Washington trial courts to use only the approved pattern instruction WPIC 4.01 to instruct juries that the government has the burden of proving every element of the crime beyond a reasonable doubt. 161 Wn.2d 303, 318, 165 P.3d 1241 (2007). The *Bennett* Court reasoned:

> Even if many variations of the definition of reasonable doubt meet minimal due process requirements, the presumption of innocence is simply too fundamental, too central to the core of the foundation of our justice system not to require adherence to a clear, simple, accepted, and uniform instruction.

161 Wn.2d at 317-18.

In full, WPIC § 4.01 provides:

24

> The defendant has entered a plea of not guilty. That plea puts in issue every element of the crime charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence *or lack of evidence*. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence *or lack of evidence*. [If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.]

(Emphasis added.) Our trial court employed the first iteration of the highlighted phrase but omitted the second iteration.

*State v. Lundy*, 162 Wn. App. 865, 256 P.3d 466 (2011), is dispositive. In *Lundy*, the trial court modified the WPIC by reversing the order of the first two paragraphs and modifying the first three sentences of the paragraph on the State's burden of proof. 162 Wn. App. at 871. Instead of WPIC § 4.01 paragraph one, the trial court in *Lundy* instructed the jury:

> Each crime charged by the State includes one or more elements which are explained in a subsequent instruction. The State has the burden of proving each element of a charged crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.

162 Wn. App. at 871. The Lundy court wrote: "Because our Supreme Court has unambiguously directed trial courts to use only WPIC 4.01, the trial court erred by modifying the instruction." 162 Wn. App. at 871.

25

The *Lundy* court found the error harmless.

> An erroneous jury instruction, however, is generally subject to a constitutional harmless error analysis. We may hold the error harmless if we are satisfied "beyond a reasonable doubt that the jury verdict would have been the same absent the error." Even misleading instructions do not require reversal unless the complaining party can show prejudice.

*Lundy*, 162 Wn. App. at 871-72 (citations omitted). Because Lundy could not show that he was prejudiced by the instruction or that it relieved the State of its burden of proof, this court was satisfied beyond a reasonable doubt that the jury verdict would have been the same absent the error. *Lundy*, 162 Wn. App. at 873.

Christopher Carlson, the State, and the *Lundy* court point out that "Division One of this court declined to apply a harmless error analysis to a trial court's failure to use the WPIC" in *State v. Castillo*, 150 Wn. App. 466, 208 P.3d 1201 (2009). *Lundy*, 162 Wn. App. at 872. *Castillo* is readily distinguishable from *Lundy* and the instant case. In *Castillo*, the trial court expressly refused to follow *Bennett*, referring to WPIC § 4.01 as "gobbley-gook." *Castillo*, 150 Wn. App. at 470. The instruction in *Castillo* included: "A 'reasonable doubt' is not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in the case. It is an honest misgiving caused by insufficiency of proof of guilt." 150 Wn. App. at 470.

Comparatively to the jury instruction in *Castillo*, the instruction in *Lundy* and especially the instruction in this case substantially conformed to WPIC § 4.01. Our trial court left the same language of "or lack of evidence" in the first sentence of the burden of

26

proof paragraph.

Christopher Carlson cannot show prejudice from the slight deviation from WPIC §
4.01. The missing phrase "or lack of evidence" did not relieve the State of its burden,
given the trial court provided WPIC § 4.01's first and second paragraphs verbatim. This
court assesses jury instructions "as a whole." *Bennett*, 161 Wn.2d at 307. Furthermore,
the critical issue at trial was not the lack of evidence, but whether the jury found M.J.
credible. It did.

### Statement of Additional Grounds (SAG)

In his pro se brief, Christopher Carlson raises eighteen additional claimed errors.
Carlson alleges foul play against him, which included the theft of his truck and hacking
of his bank account. Carlson further faults his defense counsel for refusing to investigate
this foul play. The current record is insufficient to allow review of these issues. *State v.
McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Christopher Carlson contends he was unfit to stand trial due to malnutrition.
Again, the current record is insufficient. Carlson repeatedly claims that there was a
"failure to instruct jury" on the correct interpretation, meaning, or weight of different
evidence. Neither the trial court nor defense counsel could instruct the jury to construe
evidence in a manner favorable to Carlson. "Judges shall not charge juries with respect
to matters of fact, nor comment thereon, but shall declare the law." CONST. art. IV, § 16.

Last, Christopher Carlson contends the trial court erred when it excluded evidence

27

of previous, neighborly interactions between Carlson and M.J. under Washington's rape shield statute. SAG at 4-5; 1RP 19-20, 22.

> [E]vidence of the victim's past sexual behavior including but not limited to the victim's marital behavior, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent, except where prohibited in the underlying criminal offense, *only pursuant to the following procedure*.

RCW 9A.44.020(3) (emphasis added). That procedure requires "[a] written pretrial motion," "accompanied by an affidavit or affidavits in which the offer of proof shall be stated." RCW 9A.44.020(3)(a), (b). Carlson did not forward such a motion. Thus, the trial court did not err when, on the first day of trial, it ruled the evidence was "covered by the rape shield statute and should not be admitted unless that statute is complied with, which it has not been." RP (Feb. 27, 2013) at 22.

## CONCLUSION

We affirm Christopher Carlson's convictions.

A majority of the panel has determined this opinion will not be printed in the

No. 31610-6-III
*State v. Carlson*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

29