IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78811-6-I |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY OMAR CHARLESTON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. – Stanley Charleston appeals his convictions and sentence for two counts of second degree assault and one count of unlawful imprisonment stemming from events that occurred on October 8, 2017, while Charleston was experiencing a drug-induced psychotic episode. Charleston argues that the trial court erred when it denied Charleston's motion to proceed pro se and when it refused to instruct the jury on voluntary intoxication and the inferior degree offense of fourth degree assault. He further contends his convictions violate the prohibition on double jeopardy. In a Statement of Additional Grounds, Charleston also maintains that the court violated his speedy trial rights.

We conclude the trial court did not err here and affirm Charleston's convictions and sentence.

Citations and pin cites are based on the Westlaw online version of the cited material.

<u>FACTS</u>

In the early hours of October 8, 2017, Sarah[1] returned to a friend's first-floor apartment at Ninth Avenue and Marion Street on First Hill in Seattle.  As Sarah inserted the key into the exterior door lock, a man, later identified as Charleston, ran at her, grabbed her by her hair, threw her to the ground, and began striking her repeatedly with an aluminum broom handle.  When Charleston screamed at her, Sarah could not understand anything he said.

Just before the attack, around 2 a.m., James finished a music gig at a nearby restaurant and walked to his parked car.  He saw Charleston chasing a man down the sidewalk while waving some type of a stick in the air.  When James approached his car, he saw Charleston return, enter an apartment building, and then attack Sarah.  He saw Charleston, who was yelling nonsensically, drag Sarah outside and beat her with a stick around a dozen times.

James decided to intervene because the conduct was "over the top violent" and because Charleston was "whaling on this woman."  He first called the police and then yelled at Charleston to stop.  James expected Charleston to flee, but Charleston surprisingly charged him and hit him in the face with a stick "a couple times."  James tackled Charleston to the ground, and another man passing by helped him subdue Charleston until police arrived.

Officer Elliott Averett was the first officer to respond.  He saw two men holding Charleston down and also noticed a pair of scissors and a bent, lightweight, aluminum broom handle nearby.  He kicked the possible weapons

---

[1] To preserve the victims' privacy, we will refer to them by their first names only.  We mean no disrespect.

away from everyone's reach. Officer Averett tried to speak to Charleston, but Charleston "was pretty incoherent." Instead of answering the officer's request for identification, Charleston said "something about being a light bearer" and "yell[ed] out Islamic religious references."

The police initially handcuffed all three men until James explained what had happened. After determining that Charleston was the likely assailant, the officers arrested him. Officer Averett testified that because of Charleston's incoherence and demeanor, he thought Charleston was mentally ill, high, or both.

Firefighter EMT Carol Wisman evaluated Charleston for injuries while he sat handcuffed in the back seat of the police vehicle. She too thought Charleston appeared high. Wisman believed his mental status was altered or he was having a behavioral or psychiatric episode. Wisman determined Charleston was likely high because of her experience with "many, many, many" people under the influence of drugs.

Officer Travis Jordon arrived on the scene and heard Sarah screaming for help at the doorway of her apartment building. He attended to Sarah while the other officers interacted with the three men on the street. He saw she was bleeding from her head. Sarah told Officer Jordon she had been attacked by a stranger while inserting the key into the deadbolt of the building's front door. Jordon noticed the key still inside the deadbolt, bent.

As a result of the attack, Sarah suffered a one-inch laceration to her scalp. A CAT[2] scan revealed that Sarah also had a hematoma, or a collection of blood

---

[2] Computed tomography. Also known as a CT scan. https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675.

under the scalp. Dr. Hess decided that hematoma treatment would be unnecessarily invasive and closed the cut to her scalp with two to three staples that remained in place for two weeks. In addition to these injuries, Sarah had bruises to the back of her shoulders, her side, and the back of her head where Charleston had pulled her hair, making it impossible for her to sleep well for three days.

She also sustained an injury to her right hand. Sarah testified that when she arrived at the hospital, her hand was so swollen that the doctors could not perform an X ray and had to cut her rings off her fingers. The doctor who attended to her in the emergency room, Dr. Jeremy Hess, could not determine if any bones were broken. As a precaution, Dr. Hess put Sarah's hand in a splint and recommended she follow up with her personal physician to rule out any fracture. Sarah had to keep the splint on her hand for two weeks, making her dependent on others to assist her to eat, bathe, and dress.

Sarah also testified that she was so afraid during the assault that she lost control of her bowels and defecated on herself. Dr. Thomas Cherry, Sarah's primary care provider, testified that such bowel incontinence is not uncommon when someone experiences a severe trauma because their entire nervous system "is just kind of on override." He opined that her loss of bowel control under such circumstances is the loss of the function of a bodily organ.

James suffered a golf ball-sized lump on his head, a loose tooth, a cut on his lip that required stitches, and a fractured ankle. Dr. William Lemley, the radiologist who reviewed James's X rays, diagnosed a break in the fibula just

below the mid-lower leg, extending down to the ankle joint. James used crutches for two weeks and had his ankle immobilized in a boot for another six weeks.

The State charged Charleston with first degree burglary, assault in the second degree, and unlawful imprisonment relating to the attack of Sarah and second degree assault relating to the attack of James. At trial, Sarah and James testified about the attacks and their resultant injuries. The jury also heard testimony from law enforcement officers who were present on the scene and from medical professionals who participated in treating Sarah and James after the assaults. Charleston testified in his defense, as did forensic psychiatrist Dr. Mark McClung.

The jury acquitted Charleston of first degree burglary but found him guilty of second degree assault of James and second degree assault and unlawful imprisonment of Sarah. In a second phase of the trial, the jury found Charleston had committed these crimes shortly after being released from incarceration.

The court imposed an exceptional sentence based on the aggravating factor of "rapid recidivism," under RCW 9.94A.535(3)(t). The court sentenced Charleston to a total of 35 months' confinement: 15 months for the assault of James, 20 months for the assault of Sarah, and 9 months for the unlawful imprisonment of Sarah. It ordered the two assault counts to run consecutively to one another, with the unlawful imprisonment count running concurrently with the second assault count.

Charleston appeals his convictions and sentence. Charleston makes several arguments on appeal. First, he argues that he was deprived of his

constitutional right to represent himself. Second, he argues that the trial court erred in denying his request for a jury instruction on voluntary intoxication and on the inferior degree offense of fourth degree assault. Third, he argues that his convictions for assault and unlawful imprisonment of Sarah violate the prohibitions on double jeopardy. Finally, Charleston submitted a Statement of Additional Grounds (SAG) in which he argues that his speedy trial rights were violated when the trial court granted three continuances in May 2018 and failed to commence his trial until after the speedy trial deadline expired. We address each argument in turn.

## ANALYSIS

1. Charleston's Self-Representation Request

Charleston first argues the trial court deprived him of his constitutional right to self-representation. We disagree because the trial court did not abuse its discretion in concluding Charleston did not make an unequivocal request to represent himself.

"The United States Supreme Court recognizes a constitutional right of criminal defendants to waive assistance of counsel and to represent themselves at trial." State v. DeWeese, 117 Wn.2d 369, 375, 816 P.2d 1 (1991). "[A] court cannot force a defendant to accept counsel if the defendant wants to conduct his or her own defense, as the Sixth Amendment grants defendants the right to make a personal defense with or without the assistance of an attorney." Id.; see also Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

Because a request to proceed pro se involves the waiver of a constitutional right, namely the right to counsel, "appellate courts have regularly and properly reviewed denials of requests for pro se status under an abuse of discretion standard." State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010). "The grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences." Id. at 504-05. "A court may not deny a motion for self-representation based on grounds that self-representation would be detrimental to the defendant's ability to present his case or concerns that courtroom proceedings will be less efficient and orderly than if the defendant were represented by counsel." Id. at 505. "Similarly, concern regarding a defendant's competency alone is insufficient; if the court doubts the defendant's competency, the necessary course is to order a competency review." Id. An appellate court "give[s] great deference to the trial court's discretion because the trial court is in a favorable position to the appellate courts in evaluating a request to proceed pro se." State v. Burns, 193 Wn.2d 190, 202, 438 P.3d 1183 (2019).

When evaluating a defendant's request to represent himself, the trial court must first determine whether the request is unequivocal and timely. Id. at 203. The trial court must decide whether the request is knowing, voluntary, and intelligent. Id. "The threshold issues of timeliness and equivocality focus on the nature of the request itself—if, when, and how the defendant made a request for self-representation—not on the motivation or purpose behind the request." State v. Curry, 191 Wn.2d 475, 486-87, 423 P.3d 179 (2018). And "[t]he method for

determining whether a defendant understands the risks of self-representation is a colloquy on the record. Burns, 193 Wn.2d at 203.

Charleston was charged with burglary and second degree assault on October 11, 2017. His trial was initially set for January 17, 2018. The court continued his trial date on multiple occasions at the request of his defense attorneys, once after counsel had to withdraw and a new attorney was appointed to represent him, and several times because defense counsel needed time to conduct discovery, retain an expert, and have the expert complete his evaluation of Charleston. Charleston objected to many of these continuances. Only one continuance was granted at the State's request to allow it time to interview Dr. McClung. In many of the hearings, Charleston challenged the court's computation of his speedy trial deadline under CrR 3.3.

At a January 26, 2018 hearing, Charleston asked the court to clarify why it had moved his speedy trial deadline. The court explained to Charleston that each time the court granted a trial continuance, the rule required it to reset the speedy trial deadline for 30 days after the new trial date. When the court indicated it intended to continue trial to February 28, 2018, Charleston told the trial court he could represent himself. The court calendared his oral motion for the following Monday, January 29, 2018.

During the January 29 hearing, Charleston moved to have his assigned counsel withdraw. The trial court asked Charleston if he was seeking a new attorney, to which Charleston replied that he was "asking [the court] to assert [his]

rights" to a speedy trial. Charleston complained that his attorney had waived his right to a speedy trial without consulting him. After this exchange, the court said:

> COURT: Sir, do you want a new attorney? Or do you want to be your own attorney? Or is this morning you just wanted to put on the record again, your objection to your trial being moved?
>
> . . .
>
> DEFENDANT: Objection to my trial being moved and ask the court to consider it. I wanted to, if he's not going to be ready for trial, yeah, I think I do -- I can proceed to go to trial and would ask for him to be a standby.
>
> COURT: Okay. So that sounds like you're wanting to be your own attorney?
>
> DEFENDANT: That's what it sounds, that's what it is.
>
> COURT: So is that what you're asking me to do this morning?
>
> DEFENDANT: Yes, I am.
>
> COURT: So one thing you need to know is if I let you –
>
> DEFENDANT: For him as my standby.
>
> COURT: You're not going to have a standby attorney. If you are your own attorney, you're your own attorney.

Charleston told the court that before he could make an informed decision, he wanted to calculate the expiration of his speedy trial right and wanted to know if he could be released from confinement pending trial. The trial court asked Charleston to consult with his counsel regarding a potential bail review hearing and to re-note the motion if he decided to pursue self-representation.

Charleston did re-note a motion to proceed pro se and, on January 31, appeared before a different judge to address that request. Charleston's attorney noted on the record that Charleston had completed a pro se packet, and

Charleston told the court he wanted to represent himself because his first attorney had not informed him that he had signed a speedy trial waiver and his current attorney had requested a continuance over his objection. Charleston told the court he wanted to represent himself so he would not be forced to waive those rights again.

The trial court began a colloquy on the record regarding his request. It cautioned Charleston of the difficulties of self-representation and informed him that he could not have standby counsel if he proceeded pro se. Again, Charleston claimed his speedy trial rights had been violated and wanted the court to reconsider this issue, rather than his motion to represent himself. At that point, the court informed Charleston that it could not entertain a speedy trial motion without it being properly noted for a hearing and briefed by the parties. It again cautioned Charleston of the difficulties of self-representation, particularly when raising a speedy trial argument. Charleston did not acknowledge the trial court's warnings, and instead he proceeded again to argue that his speedy trial rights were being violated. At that point, the trial court denied without prejudice Charleston's motion to represent himself, reasoning that Charleston really sought a ruling on a speedy trial motion, not on a motion for self-representation.

Based on this record, we conclude the trial court did not abuse its discretion in denying Charleston's motion for self-representation because his request was equivocal. The January 29 request was equivocal because Charleston said he needed to think about going pro se, negating any argument that his request that day was explicit or clear. And although Charleston noted his motion for a hearing

on January 31, his argument that day focused solely on his contention that his speedy trial rights had been violated. Despite the trial court's repeated attempts to ask Charleston if he wished to represent himself, Charleston kept repeating that he wanted to discuss his speedy trial right claim. Moreover, when the court asked, for a final time, whether Charleston's intent was to represent himself, he noted that he wanted to do so if he could have standby counsel. Even when Charleston said he wanted to represent himself, he always qualified that statement by indicating it was conditioned on having standby counsel appointed to assist him. The trial court did not abuse its discretion when it denied Charleston's motion to represent himself.

2. Voluntary Intoxication Instruction

Charleston next asserts the trial court erred when it refused his request for an instruction on voluntary intoxication. Charleston argues the jury should have been permitted to consider whether Charleston's drug intoxication impacted his ability to form the requisite intent to commit any of the charged crimes. But the evidence does not support this argument. Dr. McClung, a forensic psychiatrist, opined that Charleston had the capacity to form the intent to commit his crimes, and Charleston himself admitted he acted intentionally to protect himself from harm. We thus conclude the trial court did not abuse its discretion when it refused to instruct the jury on voluntary intoxication.

This court reviews the adequacy of jury instructions based on an error of law de novo. State v. Clausing, 147 Wn.2d 620, 626–27, 56 P.3d 550 (2002). But when the trial court refuses to give an instruction based on the facts of the case,

this court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion. State v. Henderson, 180 Wn. App. 138, 144, 321 P.3d 298 (2014); State v. Hunter, 152 Wn. App. 30, 43, 216 P.3d 421 (2009); State v. Hernandez, 99 Wn. App. 312, 318, 997 P.2d 923 (1999). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or untenable reasons. State v. Neal, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). A trial court's decision is based on untenable grounds or untenable reasons if it is based on an incorrect legal standard. State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

The State argues Charleston waived this issue by failing to advocate for the voluntary intoxication instruction below. We disagree. During pretrial motions, the State moved to exclude the testimony of defense forensic psychiatric expert, Dr. McClung, as to the defenses of diminished capacity and voluntary intoxication. The State argued that Dr. McClung had opined, in his report, that Charleston's drug use and psychiatric condition had not impacted Charleston's ability to form the intent to commit the crimes. The court granted the State's motion to exclude Dr. McClung's testimony as to diminished capacity and voluntary intoxication because Dr. McClung's report and deposition both stated that he did not believe Charleston's symptoms at the time rendered him unable to form intent at the time of the crime.

At trial, Charleston testified that on October 7, 2017, after ingesting drugs, he began to experience auditory and visual hallucinations. During the early morning hours of October 8, the morning of his arrest, he had visions of what he

called "duplicates" or "opposites" of people he knew.[3]  Charleston heard gunshots and the voice of his girlfriend, Monica, screaming.  He said he became scared for his life.  The voice in his head told him the shooter was "Zebra," a man he knew from the Jungle, a homeless encampment in Seattle.  Charleston had never experienced a similar episode when sober.

Charleston testified that he then started seeing Zebra "opposites" from whom he believed he needed protection.  Prompted by the earlier gunshot sounds and Zebra's voice in his head, Charleston grabbed an aluminum broom handle and chased a man he believed to be Zebra.  While chasing Zebra, Charleston noticed a stranger, later identified as James, whom he described as "ducking behind a car" and thought James was preparing to shoot him.  Charleston ran the opposite direction, and encountered Sarah, whom he believed to be another "opposite" of Zebra.

Charleston admitted he grabbed Sarah, threw her down, and struck her with the broom handle.  He also admitted "[i]t wasn't an accident.  I intended to protect myself," because he thought she was Zebra.  Charleston stated he used enough force to make sure Zebra "didn't hurt" him.  Charleston also testified that he struck James in the face with the same broom handle more than once and that he meant to hit him.

Dr. McClung, who evaluated Charleston on March 16, 2018, and on April 6, 2018, testified that on October 8, Charleston was suffering from a substance-

---

[3] Charleston referred to these doubles as "doppelgangers," which are "a ghostly double of a live person that haunts [someone] through life and is usually visible only to himself."  WEBSTER'S THIRD NEW INT'L DICTIONARY 674 (2002).

induced psychotic disorder. In Dr. McClung's opinion, Charleston was also intoxicated on methamphetamine at the time of the crime. Dr. McClung believed Charleston's psychosis caused his delusions and hallucinations that led to his paranoia and altered his sense of danger. But Dr. McClung testified, as he had done in his report and deposition, that Charleston's symptoms did not render him unable to form the intent to commit his crimes.

At the conclusion of trial, Charleston offered a voluntary intoxication instruction in his proposed instructions packet. During the instruction conference, the following exchange occurred:

> COUNSEL: And just so that we can truncate things, I want to note I included the voluntary intoxication and diminished capacity instructions. I understand the court's previously ruled on these issues, and the testimony wasn't allowed on those issues. I have included them in my packet only to preserve the issue for appeal that they are proposing those. I don't -- I'm not asking for the court to revisit the argument at this point.

> THE COURT: Okay. Good. Because I was not going to let you have it anyway.

> COUNSEL: I understand. I just didn't want to waste the court's time.

The court indicated it refused to give these instructions, stating "the court has previously ruled those [defenses] were not available to Mr. Charleston, and so I will not be providing those instructions."

We conclude Charleston preserved this issue for appeal by offering evidence of Charleston's voluntary intoxication at trial and by offering a voluntary intoxication instruction at the conclusion of trial. The court clearly ruled, in denying the proposed instruction, that Charleston could not argue he lacked the capacity

to form the intent to commit any of the charged crimes. We thus reject the State's contention that Charleston did not preserve this instructional issue for appeal.

But we also conclude the trial court did not abuse its discretion in denying the requested voluntary intoxication instruction. "RCW 9A.16.090 states that voluntary intoxication does not make an act 'less criminal', while on the other hand the statute states that intoxication 'may be taken into consideration' by the jury in determining whether the defendant acted with the requisite mental state." State v. Coates, 107 Wn.2d 882, 889, 735 P.2d 64 (1987) (quoting RCW 9A.16.090). A defendant is only entitled to a voluntary intoxication instruction when (1) the crime charged has as an element a particular mental state, (2) there is substantial evidence the defendant was drinking and/or using drugs, and (3) the defendant presents evidence that the alcohol or drugs affected his or her ability to acquire the required mental state. State v. Gallegos, 65 Wn. App. 230, 238, 828 P.2d 37 (1992); State v. Webb, 162 Wn. App. 195, 209, 252 P.3d 424 (2011) (applied test to drug intoxication). "When determining if the evidence at trial was sufficient to support the giving of an instruction, the appellate court is to view the supporting evidence in the light most favorable to the party that requested the instruction." State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The first part of the test is met. Charleston's crimes each had as an element a particular mental state. To convict Charleston of assault in the second degree, the State had to prove Charleston "intentionally assaulted" his victims and "recklessly inflicted substantial bodily harm." To act with intent or intentionally means to act with "the objective or purpose to accomplish a result that constitutes

a crime." RCW 9A.08.010(1)(a). A person is reckless when "he or she knows of and disregards a substantial risk that a wrongful act may occur and disregards a substantial risk that a wrongful act may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation."

To convict Charleston of unlawful imprisonment, the State had to prove Charleston had "knowledge" that he restrained Sarah in a manner that substantially interfered with her liberty, either without her consent or by physical force, and the restraint was without legal authority. A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he is aware of that fact, circumstance, or result. RCW 9A.08.010(b).

Voluntary intoxication can negate the mental state of intent. See State v. Brooks, 97 Wn.2d 873, 651 P.2d 217 (1982) (defendant charged with first degree murder entitled to instruction upon showing intoxication affected either premeditation or intent). And although voluntary intoxication is usually associated with intent crimes, the defense is also appropriate when the defendant is charged with a crime for which a lesser mental state is required. See State v. Lottie, 31 Wn. App. 651, 653, 644 P.2d 707 (1982) (holding that voluntary intoxication can negate the mental state of knowledge). Here, if there was sufficient evidence to establish that Charleston's voluntary intoxication with drugs impaired his ability to form intent or to act knowingly, and thus recklessly, then this instruction would have been appropriate.

The second part of the test is also met. Charleston presented evidence that he consumed drugs and possibly alcohol on October 7, some hours before the assaults at 2 a.m. on the morning of October 8. Charleston testified that he had smoked marijuana, used methamphetamine, and drank alcohol during the week preceding the assaults. Dr. McClung testified that Charleston admitted to him that he had resumed drug use, including methamphetamine, after being released from jail a week before the incident.

But even if Charleston presented sufficient evidence that he was intoxicated at the time he assaulted Sarah and James, the evidence, when taken in the light most favorable to Charleston, is insufficient to meet the third element of the test. Charleston had to present evidence that his drug use affected his ability to acquire the required mental state. The evidence must "reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." Webb, 162 Wn. App. at 210, quoting State v. Gabryschak, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996). The evidence here failed to make this necessary connection.

Charleston's main defense at trial was that he acted intentionally, in self-defense, because he believed he was in danger of imminent harm. Charleston testified that he believed Sarah was Zebra, whom he believed posed a danger to him. Charleston admitted he grabbed a broom with the intent to protect himself. He further admitted that in order to protect himself, he had to swing the broom to "make sure that Zebra didn't hurt me." Charleston later admitted, during cross-examination, that he grabbed a broom, threw Sarah to the ground, and hit her with

it with the intent to "disable" her. He admitted his actions were not accidental, and he intended to hit the person he believed to be Zebra. This evidence may establish that Charleston's drug use may have led him to mistake Sarah for someone else, but it did not prevent him from forming the intent to grab her, throw her to the ground and strike her with the broom handle.

Similarly, Charleston testified that when he heard James's voice, he thought James was going to hurt him. So he hit James with the stick to protect himself and testified that he meant to do so. Again, Charleston's drug use may have led him to believe erroneously that James posed a threat to him, but the drug use did not impair his ability to form the intent to assault James.

Finally, Dr. McClung testified that Charleston had the capacity to form the intent to commit these assaults. Dr. McClung testified that he reached this conclusion because Charleston described to him his "conscious reasons" for committing the assaults.

We thus conclude there was insufficient evidence to conclude that Charleston's intoxication affected his ability to acquire the required mental state to commit assault and unlawful imprisonment. The trial court did not abuse its discretion in denying Charleston's request for this instruction.

3. Fourth Degree Assault Instruction

Charleston argues on appeal that he was entitled to an instruction on fourth degree assault because the jury could have concluded the assaults on Sarah and James did not cause "substantial bodily harm," and did not constitute second

degree assault. We conclude the trial court did not abuse its discretion in denying Charleston's proposed inferior degree instruction under the facts of this case.

Under RCW 10.61.003, a defendant can be found guilty of a crime that is an inferior degree of the crime charged. Fernandez-Medina, 141 Wn.2d at 453. An instruction on an inferior degree offense is proper when:

> (1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997).

Because the parties only disagree as to whether the evidence at trial was sufficient to show Charleston "committed only the inferior offense," the resolution of this issue requires analysis of only that third requirement, known as "the factual component." Fernandez-Medina, 141 Wn.2d at 454-55. When only the factual component is at issue, we review the refusal to instruct the jury on the inferior degree offense of fourth degree assault for an abuse of discretion. State v. LaPlant, 157 Wn. App. 685, 687, 239 P.3d 366 (2010).

"[A] requested jury instruction on a lesser included or inferior degree offense should be administered 'if the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater.'" Fernandez-Medina, 141 Wn.2d at 456 (quoting State v. Warden, 133 Wn.2d 559, 563, 947 P.2d 708 (1997)). "[T]he evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." Id.

- 19 -

RCW 9A.36.021(1)(a) states: "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.041(1) states: "A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another."

Charleston requested an instruction on fourth degree assault at the conclusion of trial. The trial court initially granted Charleston's request, but it later changed its ruling:

> . . . I think in looking at the evidence that is before the court, I cannot find that the evidence raises an inference that only assault 4 was committed. Yes, the jury may not believe that there was substantial injury, bodily injury as defined, but the jury may also believe that there was substantial bodily injury as defined. And because the evidence does not exclude that as a possibility, it is the court's opinion that the law states that it is factually not permissible to instruct to provide the lesser instruction on assault 4."

It concluded the evidence did not establish that Charleston committed only the inferior offense of fourth degree assault.

The State alleged Charleston committed second degree assault by intentionally assaulting Sarah and James and recklessly inflicting substantial bodily harm under RCW 9A.36.021(1)(a). Charleston contends on appeal that the jury could have reasonably concluded that Sarah's injuries did not meet the legal threshold of "substantial bodily harm," that Charleston did not cause James's ankle fracture, or that Charleston did not act recklessly when he attacked either victim.

- 20 -

(a) Substantial Bodily Harm

Charleston does not argue that the State presented insufficient evidence to prove assault in the second degree as to Sarah. Instead, he maintains that the jury could have found that her injuries did not meet the legal threshold of "substantial bodily harm" because she suffered no broken bones or internal injuries and the scalp laceration and hand injury caused only temporary discomfort.

"Substantial bodily harm" is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b).

The State contended below that the extensive bruising Sarah experienced and the scar resulting from the staples used to close her scalp laceration constituted "temporary but substantial disfigurement." It further argued Sarah's loss of bowel control during the assault was the temporary but substantial loss of the function of her nervous system. And it maintained her wrist injury, requiring complete immobility for two weeks, and limited use for weeks thereafter, was a temporary, but substantial impairment of a function of a body part.

Charleston argues that even if the jury believed the State's evidence regarding the extent of Sarah's injuries, it could have found they were not "substantial." He points, as support for this argument, to the jury's question during deliberations: "With regard to Instruction 19 is there a legal definition of "substantial" as used in "substantial disfigurement" and "substantial loss or impairment," or is this a matter for the jury to decide?"

But the statute defining fourth degree assault specifically requires that the evidence not rise to the level of first, second, or third degree or custodial assault. RCW 9A.36.041. In State v. Stationak, 73 Wn.2d 647, 649-50, 440 P.2d 457 (1968), our Supreme Court considered whether the defendant, charged with assault in the first degree, was entitled to an instruction of third degree assault based on inconsistent testimony as to whether the defendant knew the gun he used was loaded. The court acknowledged there was evidence to justify an instruction for first or second degree assault, but third degree assault is defined as one "not amounting to assault in either the first or second degree." Id. at 649. It held that "if the facts of the case are such that defendant could have been found guilty of either first or second degree assault, then he could not have been found guilty of third degree assault." Id. at 649-50. The court concluded that under the evidence presented in that case, "the defendant was guilty of first or second degree assault or of none at all," making the proposed instruction on third degree assault properly refused. Id. at 650.

Similarly, here, the evidence was sufficient to support the jury's second degree assault conviction. In State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011), our Supreme Court held that the term "substantial," as used in RCW 9A.36.021(1)(a), "signifies a degree of harm that is considerable." The court concluded that evidence that a defendant punched his victim in the head several times and pushed him to the ground, causing facial bruising and swelling and lacerations to his face, head, and arm was sufficient to allow the jury to find that the injuries constituted substantial but temporary disfigurement. Id. at 806.

- 22 -

Sarah's injuries were no less severe than those described in McKague. And there was no factual dispute that Sarah was injured or that Charleston caused them. Because the evidence was sufficient to establish second degree assault and Charleston presented no affirmative evidence that he did not cause Sarah's injuries during the assault, he was either guilty of assault in the second degree or not guilty at all. The trial court did not abuse its discretion in rejecting the proposed fourth degree assault instruction as to Sarah.

(b) Causation as to James's Ankle Fracture

Charleston argues that, as to James, a reasonable jury could have found that Charleston did not cause James's ankle fracture and this injury occurred only after James tackled Charleston and a passerby helped James restrain Charleston. He also contends the jury could have concluded that James's remaining injuries— the broken tooth, the knot on his head, and his facial lacerations—did not constitute a "substantial disfigurement."

But Charleston did not make any such argument at trial. In fact, in closing, Charleston's counsel conceded the State had established substantial bodily injury: "I am not going to stand here and tell you that [James's fracture is] not substantial bodily injury." Instead, he argued the jury should conclude Charleston reasonably believed he was acting in self-defense.

And even if Charleston had argued that he did not cause the ankle fracture, Charleston appears to concede that James's remaining facial injuries met the legal definition of substantial bodily harm. Given that there was sufficient evidence to

- 23 -

convict Charleston of assault in the second degree, the court did not abuse its discretion in rejecting a fourth degree assault instruction was James.

(c) Recklessness

Finally, Charleston argues the jury could have found he did not act recklessly, relying on this court's recent decision in State v. Melland, 9 Wn. App. 2d 786, 452 P.3d 562 (2019). But the facts of this case are distinguishable from Melland. In that case, Melland was convicted of assault in the second degree based on medical providers' testimony that Melland's girlfriend told them he grabbed a cell phone from her with such force that it broke her finger. Id. at 800. Neither Melland nor his girlfriend testified at trial so there was no evidence as to how Melland had actually broken the finger. Id. at 796. Although the State claimed he twisted her hand as he removed the phone from her hand, this court noted that there was no evidence to this effect at trial. Id. at 804. This court reversed Melland's conviction, concluding that there was insufficient evidence Melland had acted recklessly in inflicting the injuries. Id. at 805.

In this case, unlike in Melland, we have testimony from both Sarah and James, as well as testimony from Charleston himself. Both Sarah and James testified Charleston struck them in the face and head with an aluminum broomstick. Charleston testified he intended to "disable" Sarah and to prevent James from attacking him. And Charleston is not challenging the sufficiency of evidence of recklessness here.

Based on the evidence at trial, this case is more analogous to State v. R.H.S., 94 Wn. App. 844, 847, 974 P.2d 1253 (1999), in which a juvenile defendant

challenged the sufficiency of evidence that he acted recklessly when he punched another juvenile in the face. This court rejected this argument, holding that "any reasonable person knows that punching someone in the face could result in a broken jaw, nose or teeth, each of which would constitute substantial bodily harm." Id. at 847.

In this case, Charleston testified he intended to strike both Sarah and James with the broom handle. As in R.H.S., any reasonable person would know that striking a person in the face with a metal object could result in lacerations, broken bones, or broken teeth, all of which would meet the definition of substantial bodily harm. And under Stationak, 73 Wn.2d at 650, because the evidence was sufficient to establish second degree assault and Charleston presented no affirmative evidence that he did not intend to strike Sarah or James on the head or in the face during the assault, he was either guilty of assault in the second degree or not guilty at all. The trial court did not abuse its discretion when it denied Charleston's request for an instruction on fourth degree assault.

4. Double Jeopardy

Charleston next contends his convictions for unlawful imprisonment and second degree assault of Sara related to the same conduct, violate double jeopardy, and should merge. He asks this court to vacate his unlawful imprisonment conviction. We decline to do so.

This court reviews double jeopardy claims de novo. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014). Double jeopardy prevents

a person from "be[ing] twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9.

Our Supreme Court has established a three-part test to determine whether a defendant's convictions violate the prohibition on double jeopardy. State v. Freeman, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005); State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). First, we look to the statutes to determine whether they expressly authorize cumulative punishment for crimes committed during the course of one crime. Freeman, 153 Wn.2d at 771. If the statutes expressly state that an offense shall be punished separately from a related crime, such as the burglary statute, RCW 9A.52.050 does, then the legislative intent is clear and the inquiry ends. Id. But, if the legislature is not clear, the court should apply the "same evidence test," which Washington courts adopted from Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932):[4]

> In order to be the "same offense" for purposes of double jeopardy the offenses must be the same in law and in fact. If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses.

State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983).

Finally, the merger doctrine aids in determining legislative intent, even when the crimes have different elements. "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we

---

[4] In Blockburger, the Supreme Court said: "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.

presume the legislature intended to punish both offenses through a greater sentence for the greater crime." Freeman, 153 Wn.2d at 772-73. The Freeman court also noted that even if the convictions appear to be for the same crime, the offenses may be separate when they result in separate injury. Id. at 779; see also State v. Frohs, 83 Wn. App. 803, 815-16, 924 P.2d 384 (1996) ("The exception [to merger] is that if the offenses committed in a particular case have independent purposes or effects, they may be punished separately even where the applicable statute (e.g., first degree kidnapping) requires proof of another felony (e.g., robbery) to elevate the crime to first degree kidnapping.").

First, the statutes at issue here do not expressly authorize cumulative punishment for crimes committed during the course of one crime. RCW 9A.36.021(1)(a) states: "(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm." And RCW 9A.40.040 states: "(1) A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." Neither statute explicitly authorizes separate punishments for separate offenses. See Frohs, 83 Wn. App. at 812-13 (the unlawful imprisonment and fourth degree assault statutes do not expressly authorize cumulative punishment for acts committed in commission of either crime). Because the statutes do not authorize separate punishments, we must move on to the next prong of the test.

Second, the two crimes are not identical in both law and fact. Under the same evidence test, if each offense as charged includes elements not included in

the other, the offenses are different and multiple convictions may stand. Calle, 125 Wn.2d at 777. To convict Charleston of second degree assault, the State had to prove:

> (1) That on or about October 8, 2017, the defendant intentionally assaulted Sarah [];
>
> (2) That the defendant thereby recklessly inflicted substantial bodily harm on Sarah []; and
>
> (3) That this act occurred in the State of Washington.

To convict Charleston of unlawful imprisonment, the State had to prove:

> (1) That on or about October 8, 2017, the defendant restrained the movements of Sarah [] in a manner that substantially interfered with her liberty;
>
> (2) That such restraint was
>
> > (a) without [Sarah's] consent, or
> > (b) accomplished by physical force or intimidation;
>
> (3) That such restraint was without legal authority;
>
> (4) That, with regard to elements (1), (2), and (3), the defendant acted knowingly; and
>
> (5) That any of these acts occurred in the State of Washington.

A conviction for second degree assault required the jury to find Charleston recklessly inflicted substantial bodily harm, while a conviction for unlawful imprisonment does not require such a finding. And to prove unlawful imprisonment, the State had to establish a restraint, an element not necessary for assault. As this court said in Frohs, "because proof of an assault is not necessary to prove unlawful imprisonment, and because the elements of the two crimes are

different, the 'same evidence' test is satisfied." 83 Wn. App. at 814. Here, the two crimes are not the same in law or fact. The same evidence test is thus satisfied.

Finally, we conclude the two convictions do not merge. The merger doctrine, a rule of statutory construction, applies where the Legislature has clearly indicated that to prove a particular degree of a crime, such as second degree assault, the State must prove not only that a defendant committed that crime, but also committed an act defined as a crime elsewhere in the criminal statutes. Freeman, 153 Wn.2d at 777-78. Here, a conviction for second degree assault was not predicated on a conviction for unlawful imprisonment, or any other crime. The unlawful imprisonment charge was not used to elevate the degree of the assault charge. Unlawful restraint is not a crime separated into degrees depending on whether the restraint is accomplished by actual force or mere intimidation. Frohs, 83 Wn. App. at 815.

Because the State did not use the unlawful imprisonment of Sarah to elevate the assault from fourth or third degree assault to second degree assault, these crimes did not merge.

Charleston also argues the assault and unlawful imprisonment convictions were based on the same conduct and have no independent "purpose and effect." This reference is to an established exception to the merger doctrine, which states that if offenses committed in a particular case "have independent purposes or effects," they may be punished separately even if the applicable statute requires proof of another felony to elevate the crime. Frohs, 83 Wn. App. at 815-16. But the fact that a defendant used force, even the same physical force, to accomplish

both the unlawful restraint and the assault does not mean the merger doctrine applies and courts are not precluded from imposing separate penalties for each conviction. Id. at 816. The legislature has instead required courts to deal with the issue of multiple convictions arising out of the same criminal act to be treated as one crime in determining a defendant's offender score. Id.

The State conceded here that the unlawful imprisonment constituted the same criminal conduct as the assault for purposes of computing Charleston's offender score. Charleston agreed. As a result, the trial court ordered that Charleston serve concurrent sentences for the assault and the unlawful imprisonment of Sarah. Charleston is not serving any additional prison time as a result of his conviction for these two separate crimes. We thus reject Charleston's argument that the "purpose and effect" exception to the merger doctrine applies to his case.

We conclude Charleston's convictions for unlawful imprisonment and second degree assault do not violate the prohibition on double jeopardy.

5. Statement of Additional Grounds for Review

Charleston filed a Statement of Additional Grounds pursuant to RAP 10.10, in which he argues that three continuances in May 2018 violated his constitutional right to a speedy trial. He also contends the speedy trial period had expired by the time his trial commenced. He maintains that while the trial court began pretrial motions on the date his speedy trial period expired, it did not commence his trial on that date. We reject these arguments.

First, the record before this court shows that on March 9, 2018, the trial court found good cause to grant the defense a continuance to give Dr. McClung time to evaluate Charleston, which extended the speedy trial expiration date to May 9, 2018. On April 27, 2018, the trial court granted the State's motion for a trial continuance based on the defense expert's unavailability to be interviewed by the State. The court again found good cause for this continuance. This continuance extended Charleston's speedy trial expiration date to June 14, 2018.

The record lacks any additional continuance orders, but when the parties appeared for trial on June 14, Charleston contended the time to trial had expired. The State, however, informed the trial court that the criminal presiding judge had entered an order of continuance in May 2018 because the prosecutor was in another trial, at which time the court had reset Charleston's speedy trial expiration date to July 12, 2018. The parties located a copy of that order and presented it to the trial court. The trial court overruled Charleston's objection to commencing his trial, finding the order entered on June 13, 2018, reset his speedy trial expiration date to July 12, 2018.

This record is insufficient for this court to conclude that the orders entered in May 2018 violated Charleston's speedy trial rights. Without copies of these orders in the record, we cannot evaluate the basis for any of the continuances granted before the June 13, 2018 order. Thus, we cannot determine that any of the continuances entered between the April 27, 2018 order and the June 13, 2018 order were unjustified.

On this record, Charleston's speedy trial expiration date was July 12, 2018. Under CrR 3.3, a trial commences when the court calls the case for trial and hears preliminary motions. State v. Carson, 128 Wn.2d 805, 820, 912 P.2d 1016 (1996). Disposition of preliminary motions is "a customary and practical phase of a trial." Id. Here, the trial court found that it had commenced Charleston's trial on June 14, 2018, by beginning hearings on preliminary motions in limine. Indeed, that same day, the court granted the State's motion to amend the information to add charges, and conducted a CrR 3.5 evidentiary hearing. The trial court correctly concluded it had commenced trial prior to the expiration of Charleston's speedy trial period under CrR 3.3.

We thus reject Charleston's argument in his Statement of Additional Grounds.

Affirmed.

_Andrus, A.C.J._

WE CONCUR: